AMERICAN ASSOCIATION OF CHRISTIAN SCHOOLS VOLUNTARY EMPLOYEES BENEFICIARY ASSOCIATION WELFARE PLAN TRUST, by its Trustees Dr. A.C. JANNEY; Dr. Verle S. Ackerman; Dr. Walter Handford; Dr. Edward J. Nelson; Dr. Wayne Van Gelderen; Dr. Arno Q. Weniger, Jr.; and Mr. Carl Kingren, Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant–Appellee.

No. 87–7409.

United States Court of Appeals, Eleventh Circuit.

Aug. 2, 1988.

Leonard J. Henzke, Jr., Lehrfeld & Henzke, P.C., Washington, D.C., for plaintiffs-appellants.

Michael L. Paup, Chief, Appellate Section, Tax Div., Dept. of Justice, William S. Rose, Robert A. Bernstein, David M. Moore, Gary R. Allen, Washington, D.C., for defendant-appellee.

Before JOHNSON and HATCHETT, Circuit Judges, and ESCHBACH *, Senior Circuit Judge.

JOHNSON, Circuit Judge:

This tax case came before the United States District Court for the Middle Dis-

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by

trict of Alabama on cross motions for summary judgment. The American Association of Christian Schools Voluntary Employees Beneficiary Association Welfare Plan Trust ("the Trust"), through its trustees, brought this suit seeking a refund of federal income taxes paid in two tax years on the ground that the Trust was tax-exempt. The district court granted the United States' motion for summary judgment, holding that the Trust was not tax-exempt and that it had taxable income for the years in question. We affirm.

## I. STATEMENT OF FACTS

The American Association of Christian Schools, Inc. ("the Association") is a tax-exempt association of fundamentalist Christian schools formed in the early 1970's to promote Christian education. Member schools are located in all 50 states. The schools are not separate legal entities; each is a part of a sponsoring church that is a legal corporation or association. To become a member of the Association, each school must certify that it subscribes to the Association's "Statement of Faith," the basic religious principles of the Association.

The Association is governed by a board of directors, who were initially selected from among the pastors of the sponsoring churches. The replacement or addition of directors occurs by majority vote of the board. In 1980, the Association was recognized by the Internal Revenue Service ("IRS") as a tax-exempt "association of churches" within the meaning of 26 U.S.C.A. § 170(b)(1)(A)(i).

In 1981, the Association established the Trust to provide health, hospital, disability, life, accidental death and dismemberment, dental, and prescription drug insurance benefits to member school employees and their dependents and beneficiaries. The Trust is an independent legal entity. The Association's board of directors chose the original trustees, all but one of whom continue to serve as trustees. All of the current trustees, except the managing trustee,

designation.

are also on the Association's board of directors. The managing trustee is the only trustee who receives compensation for performing his duties.

The Trust is not self-insured; it contracts with commercial insurance carriers to underwrite the benefits it provides to participating schools. Schools participate in the Trust's insurance programs on a "contributory" or "non-contributory" basis. With contributory insurance, the employee pays at least part of the premium. In a non-contributory plan, the premium is fully paid by the school. Approximately 25% of the member schools participate in the Trust programs, and approximately 2,300 to 2,400 individuals are enrolled. A school may withdraw from the Trust insurance programs at any time.

In the medical insurance plan, all employees of a particular church school receive the same medical benefits in accordance with the option level (high or low) chosen by the school. In the life, accidental death and dismemberment, and disability income insurance plans, there are different benefit levels for four different classes of employees: (1) Association Directors and Trustees; (2) Pastors; (3) Administrators; and (4) other employees, including teachers. Individuals with life, accidental death and dismemberment, or disability income insurance may obtain higher coverage by qualifying and paying for it on an individual basis.[1]

The Managing Trustee has 14 clerical employees in his office in Roanoke, Alabama. The office enrolls and bills participating schools, collects premiums, receives and processes claims, and maintains Trust records. The Trust earns investment income by depositing the insurance premiums in bank certificates of deposit. The investment income is used to provide benefits to the participants or to pay administrative expenses.

The trustees administer the Trust. They serve until death, incapacity, resignation or removal. A trustee may be removed by written notice signed by two-thirds of the participating schools, as long as those schools account for at least two-thirds of the total premiums. In addition, a trustee may be removed by a majority vote of the trustees.[2]

On January 18, 1982, the Trust applied to the IRS for a private letter ruling recognizing its exemption from tax as a "voluntary employees' beneficiary association" ("VEBA") under 26 U.S.C.A. § 501(c)(9). The IRS ruled that the Trust failed to qualify for exemption. In December 1982, the Trust paid $10,038 in taxes for its fiscal year ending July 31, 1982. In March 1983, the Trust filed a claim for a refund, which the IRS denied.

In March 1984, the Trust filed an administrative claim seeking a $996 refund for taxes paid for its fiscal year ending July 31, 1983. The IRS did not act on this claim. On March 16, 1984, the Trust filed a complaint in district court seeking a refund of taxes paid during fiscal year 1982 on the ground that it was exempt from tax as a VEBA under Section 501(c)(9). The Trust contended in the alternative that it owed no taxes because it held "the insurance payments collected from its members solely in trust, for transmission to the insurance company who actually insures the risks."

In November 1984, the Trust filed amended administrative claims for refunds of taxes paid during its taxable years ending July 31, 1982 and July 31, 1983. The Trust claimed exemption from taxes as a "religious" organization under Section 501(c)(3) and as a "social welfare" organization under Section 501(c)(4). The IRS did not act on these additional claims.

On November 14, 1984, the Trust amended its complaint in district court to include a claim for the $996 tax refund for its fiscal year ending July 31, 1983. In May 1985, by its Second Amendment of Complaint, the Trust added as additional

---

**1.** The Trust claims that a participating school can decide to provide the same life insurance coverage to all employees, regardless of job classification.

**2.** The Trust Agreement requires that two-thirds of the trustees vote for removal, but the parties stipulated that a majority vote was sufficient.

grounds on which to recover taxes paid in fiscal years 1982 and 1983, the claims based on Sections 501(c)(3) and (4).

The parties then filed cross motions for summary judgment based on stipulated facts. The district court denied the Trust's motion and granted the government's. Judgment was entered accordingly. The Trust now appeals.

## II. DISCUSSION

The Trust contends that it is exempt from federal income taxes under 26 U.S.C. A. §§ 501(c)(3), (4), and (9). The parties agreed that this suit could be resolved without trial on cross-motions for summary judgment. *American Ass'n of Christian Schools Voluntary Employees Benefi- ciary Ass'n Welfare Plan Trust v. United States*, 663 F.Supp. 275, 276 n. 1 (M.D.Ala. 1987) (*"American Ass'n"*). This Court's review of a grant of summary judgment is plenary, and we apply the same legal stan- dards that bound the district court. *Liver- nois v. Medical Disposables, Inc.*, 837 F.2d 1018, 1022 (11th Cir.1988).

## A. Section 501(c)(3)

Section 501(c)(3) establishes a tax exemp- tion for "[c]orporations, and any communi- ty chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes." The Trust claims entitlement to a tax ex- emption as a religious organization. As the party claiming the exemption, the Trust must prove its entitlement to it. *Senior Citizens Stores, Inc. v. United States*, 602 F.2d 711, 713 (5th Cir.1979) (per curiam). This means that the Trust must demon- strate that it is both organized *and* operat- ed exclusively for religious purposes, 26

C.F.R. § 1.501(c)(3)–1(a)(1), before it can qualify for an exemption under Section 501(c)(3). The district court's factual find- ing that the taxpayer is not operated exclu- sively for religious purposes cannot be dis- turbed on appeal unless clearly erroneous.[3] *See Senior Citizens Stores*, 602 F.2d at 713. The existence of stipulated facts does not alter an appellate court's role in review- ing the evidence. *Church By Mail, Inc. v. Commissioner*, 765 F.2d 1387, 1390 (9th Cir.1985). However, the ultimate determi- nation that a plaintiff does not qualify for tax-exempt status remains a legal conclu- sion requiring *de novo* review by this Court. *Id.* at 1390.

■ In determining whether the Trust qualifies as a tax-exempt religious orga- nization, we are mindful that "the presence of a single [non-exempt] purpose, if sub- stantial in nature, will destroy the exemp- tion regardless of the number or impor- tance of truly [exempt] purposes." *Better Business Bureau v. United States*, 326 U.S. 279, 283, 66 S.Ct. 112, 114, 90 L.Ed. 67 (1945). In this case, we agree with the district court's finding that the Trust had a substantial private, non-exempt purpose of providing insurance. *See American Ass'n*, 663 F.Supp. at 278. The Trust operates as an insurance company, extending insurance benefits in return for premiums received based on the risk assumed by the company. The Trust maintains files, accepts claims, and issues insurance benefits. *Id.* at 277. The existence of this substantial private purpose vitiates the Trust's claim that it operates exclusively for religious purposes.

As the district court noted, the Trust is very similar to the insurance plan which the Tenth Circuit found did not qualify for tax-exempt status in *Mutual Aid Ass'n of the Church of the Brethren v. United States*, 759 F.2d 792 (10th Cir.1985). In

**3.** The Trust claims that this Court should review the district court's determination of the Trust's purpose *de novo*. To support this contention, the Trust relies on *Presbyterian and Reformed Publishing Co. v. Commissioner*, 743 F.2d 148 (3d Cir.1984) (*"P & R"*). In *P & R*, the Third Circuit stated that plenary review of the tax court's findings was appropriate because the tax court had employed an incorrect legal standard in determining the taxpayer's purpose. *Id.* at

158 n. 9. In the case at bar, the district court employed the correct legal standard. There- fore, the district court's determination that the Trust had a substantial, non-exempt purpose is entitled to deference. *See id.* at 158. Further- more, even if plenary review of this question were appropriate, we would still agree with the district court's finding that the Trust had a sub- stantial non-exempt purpose.

*Mutual Aid,* the church's Mutual Aid Association ("MAA") argued that it exclusively or primarily advanced religious principles. *Id.* at 794. The Tenth Circuit addressed this contention:

Certainly MAA was formed and promoted by church members and limits its policy sales to church members. But MAA does not give succor to souls; it sells insurance coverage. It is not supported by voluntary donations in whatever amounts the membership wishes to give; it extends benefits in return for a premium based generally upon the risk assumed.

*Id.* at 795 (footnote omitted).

In the present case, the Trust claims to be a fundamental part of the Association's ministry because it furthers the fundamental Biblical instruction that "teachers employed by the member church-schools are brothers and sisters in Christ who must be helped with their needs." The Association's religious doctrine requires each member church to care for the extraordinary physical needs of those in its congregation whose families are unable to do so. The Trust asserts that the obligation to provide for the needs of each congregation's staff is an especially important component of its religious mission. The Trust relies on *Bethel Conservative Mennonite Church v. Commissioner,* 746 F.2d 388 (7th Cir.1984), to support its position that fulfilling these objectives serves a religious purpose. In *Bethel,* the Seventh Circuit found that a church was tax-exempt within Section 501(c)(3) even though it operated an insurance plan for its congregation. The court stated that the crucial inquiry focused on the purpose to be accomplished by the insurance plan, not on the nature of the activity. *Id.* at 391.

*Bethel* is distinguishable from the case at bar. In *Bethel,* the church's Medical Aid Plan stated that its purpose was "to share and bear one another's burden (Gal. 6, verse 2 and Phil. 2:4), which may arise from Medical Needs, Hospitalization, surgery, and death of [the church's] members." *See id.* (quoting Medical Aid Plan). In contrast, the Trust agreement in the instant case stated that "the exclusive purpose of the Trust is to provide for the payment of life, sickness, accident or other benefits to employees, their dependents, or designated beneficiaries." Thus, the Trust's own statement of purpose reflects a commercial goal of insuring school employees. Although this is not dispositive of the question of the Trust's purpose, it undermines the taxpayer's claim that the Trust was established exclusively for religious purposes.

There are additional, more significant distinctions between *Bethel* and the present case. The Bethel Medical Aid Plan, which involved a single congregation, was funded with voluntary contributions taken at church services. Church members' contributions to the plan were not tied to the market value of the insurance benefits received. Conversely, the plan in the case at bar, like the plan in *Mutual Aid,* operated as an insurance business. Benefits from the Trust insurance programs are linked to premiums paid by employees or "contributions" paid by member schools on behalf of employees.

As noted above, the Trust allows schools to participate on a "contributory" or "non-contributory" basis. The contributory plan requires employees to pay part of the premium, for which they receive insurance coverage. Under the non-contributory plan, the school pays the premiums; therefore, the premiums are part of the employment benefit package paid to employees. Both scenarios are very different from *Bethel,* in which church members were eligible for insurance coverage without paying any premiums and without being employed by the church.

In short, *Mutual Aid,* not *Bethel,* provides the compelling analysis in the case at bar. Whereas the insurance plan in *Bethel* operated like a church funded by voluntary offerings, the plan in *Mutual Aid* operated as a mutual insurance company. The MAA collected premiums and engaged in underwriting practices consistent with those of the industry. *Mutual Aid,* 759 F.2d at 795. The Trust in *American Ass'n* operates the

same way.[4] Thus, the Trust's reliance on *Bethel* is misplaced. As was the case with the MAA in *Mutual Aid,* the Trust cannot qualify as a tax-exempt religious organization as defined in 26 U.S.C.A. § 501(c)(3).[5]

 As a final ground for claiming exemption under Section 501(c)(3), the Trust points to a recent amendment to the Internal Revenue Code, 26 U.S.C.A. § 501(m)(3)(D), as demonstrating Congressional intent to exempt from taxes a church or association of churches that provides "retirement or welfare benefits (or both)" for its employees. The Trust asserts that Section 501(m)(3)(D) reaffirms the IRS's established administrative practice of exempting church insurance plans from taxes. We reject this argument. We also find it curious that, despite this allegedly well-established IRS practice, the Trust failed to claim exemption on the basis of Sections 501(c)(3) or (4) prior to its amended administrative claim and its Second Amended Complaint, which were filed two and one-half to three years after the original claim based on Section 501(c)(9) had been filed. Given the Trust's contention that the IRS had a long-standing practice of granting exemptions to religious organizations, such as the Trust, that provided insurance, one would have thought that a claim based on Section 501(c)(3) would have been the first ground asserted in a claim for a refund. The fact that this ground was not asserted originally suggests that the IRS practice was not well-established.[6]

 This problem aside, the fact that Congress has now passed a statutory amendment exempting church insurance plans from taxes does not aid the Trust because the effective date of Section 501(m) is "for taxable years beginning after December 31, 1985." H.R. Conf.Rep. No. 841, 99th Cong., 2d Sess., II–346, *reprinted in* 1986 U.S.Code Cong. & Admin. News 4075, 4434. Therefore, since statutes are not applied retroactively absent a clear statutory mandate, *Fordham v. Belcher Towing Co.,* 710 F.2d 709, 710 (11th Cir.1983) (per curiam), Section 501(m) does not apply here.

### B. *Section 501(c)(4)*

 Section 501(c)(4) exempts from federal income taxes "[c]ivic leagues or orga-

---

4. That the Trust is an integral part of the Association does not exempt it from tax liability because, regardless of the Trust's ties to the Association, it is a "legal entity separate and distinct" from the Association. *See Mutual Aid,* 759 F.2d at 795 n. 3.

5. The Trust attempts to distinguish *Mutual Aid* because it dealt with property casualty insurance for homes of church members. The Trust argues that the MAA insurance plan was not an integral part of the church, whereas the Trust's personal insurance is. Alternatively, the Trust argues that there is a long tradition of exempting church health, medical and life insurance plans from tax liability whereas no such tradition exists for exempting church property insurance plans. Both arguments are unavailing. The *Mutual Aid* court did not deny MAA a tax exemption based on the type of insurance MAA sold. In fact, the court admitted that the MAA had close ties to the church and its teachings, and the court did not deny that the MAA was an integral part of the church. *See Mutual Aid,* 759 F.2d at 795 n. 3. However, MAA served a commercial purpose (selling insurance) which prevented it from being tax-exempt under 26 U.S. C.A. § 501(c)(3). Because the Trust engages in a similar private, commercial purpose, it likewise cannot satisfy the Treasury Regulation test that an exempt organization be organized and operated exclusively for a religious purpose. *See* 26 C.F.R. § 1.501(c)(3)–1(a)(1).

6. The Trust relies on internal IRS documents to support its assertion that the long-standing IRS practice has been to exempt church insurance plans from paying taxes. This position is problematic for two reasons. First, unpublished rulings may not be cited or relied on as precedent, *see* 26 U.S.C.A. § 6110(j)(3), even though they may be used as evidence of IRS administrative practice. *Rowan Cos. v. United States,* 452 U.S. 247, 261 n. 17, 101 S.Ct. 2288, 2296–97 n. 17, 68 L.Ed.2d 814 (1981). Second, the ruling on which the Trust principally relies for the proposition that the IRS exempts church insurance plans, does not state that all insurance plans established by exempt organizations have routinely been granted tax-exempt status by the IRS. Instead, it indicates that exempt status depends "on the facts of the particular case." *See* Gen.Couns.Mem. 34701. The Trust must establish its claim based on the facts of this case, not based on the IRS's granting of exemptions to other organizations. *See Water Quality Ass'n Employees' Benefit Corp. v. United States,* 795 F.2d 1303, 1304 (7th Cir.1986) (it is not enough that organization seeking exemption is similar to other organizations that are exempt; it must satisfy specific statutory language).

nizations not organized for profit but operated exclusively for the promotion of social welfare." However, the Trust cannot qualify as a social welfare organization because the presence of a substantial non-exempt purpose precludes exemption under Section 501(c)(4). *See Mutual Aid,* 759 F.2d at 796. Since the Trust has a substantial private purpose to provide insurance in return for premiums, it is not an organization exclusively engaged in the promotion of the social welfare. *Id.*

## C. *Section 501(c)(9)*

■ The Trust next claims that it qualifies as a tax-exempt "[v]oluntary employees' beneficiary association[] providing for the payment of life, sick, accident, or other benefits" to the employees of member schools. *See* 26 U.S.C.A. § 501(c)(9). To qualify as a VEBA, an organization must be (1) an employees' association, (2) with voluntary membership, (3) which provides for the payment of life, sick, accident or other benefits to its members or their dependents and beneficiaries, and (4) which allows no part of the net earnings of the organization to inure to the benefit of any private shareholder or individual. 26 C.F.R. § 1.501(c)(9)–1.

■ Additional regulations explain the requirement that the VEBA be an employees' organization. The VEBA must be controlled by its membership, an independent trustee (such as a bank), or trustees, at least some of whom are selected by, or on behalf of, the membership. *Id.* at § 1.501(c)(9)–2(c)(3). In general, employee control "will be deemed to be present when the membership (either directly or through its representative) elects, appoints or otherwise designates a person or persons to serve as chief operating officer(s), administrator(s), or trustee(s) of the organization." *Id.*[7] The district court held that the employees did not have control over the trust. *American Ass'n,* 663 F.Supp. at 279. The trustees who control the plan were appointed by the Association's board of directors, which was established several years before

the Trust was created. Moreover, the Association's board is self-perpetuating because it appoints its own new members. Thus, the employees have no control over the Association's board or the trustees.

The Trust contends that it satisfies the VEBA employee control requirements because control of the Trust remains in the Association's member schools which are controlled by the church congregations of which all employees are members. In addition, the Trust asserts that the trustees exercise their authority consistent with the "mutual aid and Christian fellowship beliefs of the participating congregations toward their employees." Therefore, the Trust argues that the Association, the Trust, and the participating schools represent a religious community of interest in which the employees have a substantial voice.

While the Trust's arguments employ the language associated with control, this is not sufficient to satisfy Section 501(c)(9). Granted, the Association's directors are selected from among the pastors of the affiliated churches and each pastor is chosen by his congregation, which includes school employees. However, neither the schools nor the employees choose the pastors who sit on the board. Current directors choose new board members. In addition, although the employees participate in the selection of their congregation's pastor, the employees do so as members of the congregation, not as employees. Therefore, the employees' voting strength in the election of the pastor is diluted by the votes of congregation members who are not employees. Any potential control over the pastor is congregation control, not employee control. Moreover, even if there were employee control over the pastor, this does not translate into control over the Association's board or over the Trust because the pastors do not select the board or the trustees.

■ The Trust argues in the alternative that it satisfies the VEBA control requirements because it is an "employee welfare

7. "Whether control by or on behalf of the membership exists is a question to be determined with regard to all the facts and circumstances." 26 C.F.R. § 1.501(c)(9)–2(c)(3)(iii).

benefit plan," as defined in Section 3(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. § 1002(1). An employee welfare benefit plan which "is subject to the requirements of Parts 1 and 4 of Subtitle B, Title I of ERISA, [29 U.S.C.A. §§ 1021, 1107]," is considered to be controlled by independent trustees. 26 C.F.R. § 1.501(c)(9)–2(c)(3)(iii). Assuming the Trust is a welfare benefit plan, it does not satisfy the second part of this provision. By its own admission, the Trust is a "church plan" within 29 U.S.C.A. § 1002(33). Church plans are not subject to Parts 1 and 4 of Subtitle B of Title 1 of ERISA, unless there is an election made under 26 U.S.C.A. § 410(d) to have participation, vesting, funding and other provisions of the Internal Revenue Code apply to the church plan. Since the Trust has not alleged that such an election has been made, and since there has been no showing that the ERISA requirements have been met, this clause of 26 C.F.R. § 1.501(c)(9)–2(c)(3)(iii) has no application. Therefore, the Trust's alternative argument on the issue of employee control of the insurance plan fails.

██ An additional VEBA requirement which the district court found that the Trust failed to satisfy is the so-called "non-discrimination" requirement. This requirement is found in 26 C.F.R. § 1.501(c)(9)–2(a)(2)(i):

[E]ligibility for benefits may not be subject to conditions or limitations that have the effect of entitling officers, shareholders, or highly compensated employees of an employer contributing to or otherwise funding the employees' association to benefits that are disproportionate in relation to benefits to which other members of the association are entitled.

The Trust admits that it provides greater amounts of life and accidental death and dismemberment insurance coverage to highly paid employees. Moreover, for these types of insurance, the Trust provides the higher paid employees with greater coverage proportionate to their salaries than the lower paid employees receive. However, the Trust provides the same amount of medical and dental coverage to all employees, and the Trust asserts that total payments for all insurance coverage actually favors lower paid employees such as teachers because the costs to the schools of providing all insurance benefits to the lower paid employees is disproportionately greater than the cost of providing benefits to higher paid administrators.

Even assuming this to be the case, which the IRS disputes, this does not satisfy the VEBA regulations. The cost of providing benefits is irrelevant. The *benefits received* by higher paid employees cannot be disproportionately greater (as related to their salaries) than the benefits received by lower paid employees. *Id.* at § 1.501(c)(9)–2(a)(2)(i). The Trust does not fulfill this requirement of Section 501(c)(9). The Trust's failure to satisfy the non-discrimination requirement, like its failure to provide for employee control, demonstrates that the Trust cannot qualify for exemption under Section 501(c)(9).[8]

### III. CONCLUSION

We hold that the Trust does not qualify as a tax-exempt organization under 26 U.S.C.A. §§ 501(c)(3), (4), or (9). Accordingly, the judgment below is AFFIRMED.

8. At the trial court, the Trust also argued that, even if it was not exempt from federal income taxes, the funds it receives as premiums and as interest on those premiums are not taxable gross income. The Trust argued that it was merely a conduit between the employees and the underwriting insurance company. The district court rejected this contention, *American Ass'n*, 663 F.Supp. at 280, and it has not been argued in brief. Since the Trust invests the funds, processes the claims, and pays insurance benefits, this claim is clearly without merit.