**ARCHER–DANIELS–MIDLAND COMPANY, on its own behalf and as common parent of an affiliated group of corporations, Fleischmann–Kurth Malting Company, Incorporated, and Coeval, Incorporated, Plaintiffs–Appellees,**

v.

**UNITED STATES of America, Defendant–Appellant.**

No. 93–3939.

United States Court of Appeals, Seventh Circuit.

Argued May 17, 1994.

Decided Oct. 3, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Nov. 2, 1994.

---

4. *See supra* note 3.

**322**

James E. Peckert, A. James Shafter, Kehart, Shafter, Hughes & Webber, Decatur, IL, Felix B. Laughlin, David E. Watts, Joseph Angland (argued), Dewey & Ballantine, New York City, for plaintiffs-appellees.

Gary R. Allen, David E. Carmack, Frank P. Cihlar (argued), Dept. of Justice, Tax Div. Appellate Section, Washington, DC, Frances C. Hulin, U.S. Atty., Springfield, IL, Donald J. Gavin, U.S. Dept. of Justice, Sp. Litigation, Tax Div., Washington, DC, for defendant-appellant.

Before POSNER, Chief Judge, and HILL * and RIPPLE, Circuit Judges.

POSNER, Chief Judge.

The district judge ordered the government to refund some $18 million in taxes (plus a good deal of interest, since the taxable years in suit are 1975 through 1978) to Archer–Daniels–Midland, the agricultural giant; and the government appeals. The quarrel is over the meaning of the "DISC" provisions of the Internal Revenue Code, 26 U.S.C. §§ 991–997, which allowed exporters such as ADM to defer federal income tax on income (or, as ADM would have it, on gross receipts in some cases) obtained from those exports. We say "allowed" (past tense) because these provisions have for most purposes been superseded by the provisions on Foreign Sales Corporations, 26 U.S.C. §§ 921–27; see 2 Joseph Isenbergh, *International Taxation:* *U.S. Taxation of Foreign Taxpayers and Foreign Income* ¶ 33.3 (1990), though issues similar to those in this case may arise under the successor provisions as well. See 26 C.F.R. § 1.925(a)–1T(e)(1).

Here is how the tax shelter, created in 1971 to stimulate agricultural exports (though not limited to such exports), worked. The exporter creates a DISC (Domestic International Sales Corporation), which is simply an accounting entity that has the happy property of not being subject to federal income tax, although some of its income is taxed to the DISC's owner (in this case ADM) at once and the rest is taxed to him later. The DISC's income is determined by the price at which the owner (called a "related supplier") transfers output to it for sale abroad nominally by the DISC. The tax benefits of exporting through a DISC would be maximized if the owner could set a transfer price of zero, for then his entire export income would be attributed to the DISC. Congress didn't want to go that far to stimulate exports, so it provided in 26 U.S.C. § 994(a) that the taxable income of the DISC and of the DISC's owner "shall be based upon a transfer price which would allow such DISC to derive taxable income attributable to such [export] sale (regardless of the sale price actually charged) in an amount which does not exceed the greatest of—" and three alternatives are listed. Only two need be discussed. The second—logically the first as it seems to us, since the statute is designed to shelter income made in export sales—is 50 percent of "the combined taxable income of the DISC and [its owner] which is attributable to the" export sale, plus some expenses which we can ignore. § 994(a)(2). The first—logically the second because it is designed to provide a benefit when the income from the export sale is too slight to yield a substantial benefit under the first subsection—is "4 percent of the qualified export receipts on the sale of property by the DISC" plus, again, certain expenses that we can ignore. § 994(a)(1). ADM argues, and the district court agreed, 798 F.Supp. 505 (C.D.Ill.1992), that this subsection allows it to set a transfer price that will give the DISC

* Hon. James C. Hill of the Eleventh Circuit, sitting    by designation.

taxable income (taxable to the DISC's owner that is, with some of the tax deferred) equal to 4 percent of ADM's gross receipts from agricultural exports.

The Treasury Department disagrees. In an interpretive regulation that the district court invalidated, 26 C.F.R. § 1.994–1(e)(1)(i), the Department takes the position that subsection (1) of section 994(a) in effect supplements subsection (2). Subsection (2) allows the exporter to shift half its export income to the DISC; but should its total income, and therefore one half of that total, be meager (it might be zero), it can use subsection (1) to shield a percentage of its gross receipts (a larger figure than income) up to 4 percent. So, for example, if the exporter has sales of $100, and income of $10, it can shift $5 to the DISC via subsection (2), because $5 is 50 percent of $10. But if its income were only $6, it could shift $4 to the DISC by using subsection (1) instead, since $4 is 4 percent of $100. That is under the regulation. But under ADM's and the district judge's interpretation, even if the combined income of the DISC and its owner is zero or even negative, the owner can still shift income equal to 4 percent of its export sales to the DISC—provided that it has income elsewhere in its business, for otherwise the maneuver would confer no benefit on it.

Suppose, then, that ADM had just two divisions, and one exported agricultural products and the other manufactured children's toys for sale in the United States, and the first just broke even and the second was profitable; the first had gross receipts of $100, costs of $100, and income therefore of zero (so that subsection (2) would be worthless to it), and the second had income of $10 (its gross receipts and costs are irrelevant). ADM would fix a transfer price to the DISC of $96, generating income of $4 for the DISC, that being 4 percent of ADM's gross receipts from exports. Since ADM's total income is in fact only $10 in this example, none of it export income, the effect of its maneuver would be—if ADM's interpretation of the statute is sustained—to obtain favorable tax treatment for 40 percent of its domestic income.

ADM is right to point out that the basic purpose of the DISC program—the encouragement of agricultural exports—would be served by such an interpretation, because it would encourage unprofitable as well as profitable exports, whereas the Treasury Department's interpretation would encourage only the profitable ones. But reference to purpose cannot be conclusive in a case, such as this, where neither interpretive alternative would thwart the statute's purpose and the issue rather is how far the legislature wanted to go in subordinating competing purposes, such as the raising of government revenues by taxation. Under either interpretation, exports are encouraged; they are encouraged more by the taxpayer's interpretation than by the tax collectors'; but the question is whether Congress legislated *that* degree of encouragement. *Rodriguez v. United States,* 480 U.S. 522, 525–26, 107 S.Ct. 1391, 1393–94, 94 L.Ed.2d 533 (1987) (per curiam); *Stomper v. Amalgamated Transit Union,* 27 F.3d 316, 319–20 (7th Cir.1994); *Bushendorf v. Freightliner Corp.,* 13 F.3d 1024, 1026 (7th Cir.1993). Perhaps mindful that reference to purpose is inconclusive in a case such as this, ADM argues that its interpretation is also compelled by, rather than merely being consistent with, the statutory language. It is not compelled. The exporter is allowed to fix a transfer price that will allow its "DISC to derive taxable income *attributable* to [the export] sale," 26 U.S.C. § 994(a), and in our hypothetical sale ADM has no income from its export sales. To read section 994(a) as implying that the 4–percent–of–gross–receipts method of calculating DISC income in subsection (1) is capped at the amount of taxable income derived from export sales is not inevitable, but it is plausible, and it is supported by the legislative history. Both committee reports describe the 4 percent of gross receipts method as a way of calculating a ceiling on allowable income. H.R.Rep. No. 533, 92d Cong., 1st Sess. 74 (1971); S.Rep. No. 437, 92d Cong., 1st Sess. 107 (1971) U.S.Code Cong. & Admin. News 1971, 1825. Legislative history is in bad odor in some influential judicial quarters, see, e.g., *United States v. Taylor,* 487 U.S. 326, 344–46, 108 S.Ct. 2413, 2423–24, 101 L.Ed.2d 297 (1988) (concurring opinion) but it continues to be

relied on heavily by most Supreme Court Justices and lower-court judges; and in the case of statutory language as technical and arcane as that of the DISC provisions, the slogan that Congress votes on the bill and not on the report strikes us as pretty empty. Even advised by his personal staff a member of Congress would have great difficulty figuring out the purport of 26 U.S.C. § 994(a)(1) without the aid of the committee reports. If he (or his staff) cannot rely on them as a guide to the meaning of the statute, we are not sure what he is supposed to do.

■ Interpreted as ADM would interpret it, subsection (1) would have potentially far-reaching effects that we hesitate to impute to Congress without evidence that they were intended—effects such as encouraging purely domestic businesses to acquire export subsidiaries as tax shelters. A more plausible office to attribute to the subsection is that of serving as a complement to the next subsection. The exporter who has a low profit margin can use subsection (1) to shelter income up to 4 percent of his sales and the exporter with a high profit margin can use subsection (2) to shelter up to half his profits without regard to his total sales. Evenhanded treatment of low-margin and high-margin exporters is achieved. The statute could be clearer but in light of the considerations that we have discussed it adequately supports the Treasury's regulation, to which we are supposed to accord a certain amount of deference even when as in this case it is "interpretive"—promulgated pursuant to the Treasury's general rulemaking authority—rather than being "legislative" in the sense of having been promulgated pursuant to a specific grant by Congress of authority to regulate the area in question. *Cottage Savings Ass'n v. Commissioner*, 499 U.S. 554, 560–61, 111

S.Ct. 1503, 1507–08, 113 L.Ed.2d 589 (1991); *Gehl Co. v. Commissioner*, 795 F.2d 1324, 1328–29 (7th Cir.1986).

The judgment for ADM is therefore REVERSED.

HILL, Circuit Judge, dissenting dubitante:

At the outset, I make two acknowledgments. First, if the Secretary of the United States Treasury Department has the authority, in the form of regulation, to modify the Congressional statute before us by executive amendment, then the "no-loss rule" applies, and the opinion of the panel, as written by Chief Judge Posner, is absolutely correct. Second, the law, as crafted by the Treasury Department and approved by our panel today, may indeed be better than the one enacted by Congress.[1]

Nevertheless, I am unwilling to place my imprimatur upon Executive Branch legislation that makes changes in the statute that the Treasury Secretary believes are needed.[2] If the law is clear and unambiguous, I'd follow the law. If the law is unclear, then I'd give great deference to the interpretation of the agency involved. But, if the law says "drive from Washington to Baltimore," and the regulations say, "stop overnight in Annapolis," this direct conflict with the controlling statute should be declared invalid.

As I have said many times, I look respectfully upon the men and women of Congress as grownups who know what they are doing.[3] I find it inappropriate to patronize them by noting their imperfect work and quietly correcting it. Moreover, I have even greater respect for Article I, Section 1 of the United States Constitution that confers the power to legislate upon these fine men and women. It doesn't confer that power upon the Treasury

---

1. "It may be that the Act now created by our Court is a better or more complete Act than the one actually passed by the Congress. Who knows? Its deficiency is that ... [it] was never submitted to the people's elected representatives and adopted by them." *Wilson v. First Houston Inv. Corp*, 566 F.2d 1235, 1243 (5th Cir.1978) (Hill, J., dissenting), *vacated*, 444 U.S. 959, 100 S.Ct. 442, 62 L.Ed.2d 371 (1979).

2. This is a personality disorder often found in bureaucrats and federal judges.

3. "But if another course is to be chosen, the fine men and women who have been elected to represent the people are quite competent to the task. The judiciary should neither assume the responsibility nor usurp authority not delegated to it." *Roberts v. Austin*, 632 F.2d 1202, 1215 (5th Cir. 1980) (Hill, J., concurring specially), *cert. denied*, 454 U.S. 975, 102 S.Ct. 527, 70 L.Ed.2d 395 (1981).

Department. It doesn't confer that power upon us, the judiciary.

Without the "no-loss rule," the judgment of the district court is correct. Having—not without some hesitation—concluded that Congress did not enact the "no-loss rule," I would affirm the judgment of the district court.

So I dissent.[4]

4. This is probably just another example of the ongoing tension between the legislative, executive and judicial branches as to their appropriate roles under the Constitution.