United States Court of Appeals,
Eleventh Circuit.
No. 94-3377.

FLORIDA HOSPITAL TRUST FUND; Florida Hospital Excess Trust Fund B; Florida Hospital Workers' Compensation Self-Insurance Fund, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Jan. 2, 1996.

Appeals from a Decision of the United States Tax Court.

Before TJOFLAT, Chief Judge, KRAVITCH, Circuit Judge, and HILL, Senior Circuit Judge.

HILL, Senior Circuit Judge:

This tax appeal presents a narrow issue of first impression in this Circuit and others: do three trust funds, organized to provide a vehicle for small to mid-size member hospitals reciprocally to "self" insure each other on a group basis against hospital professional liability and workers' compensation claims, qualify as tax-exempt "cooperative hospital service organizations" for purposes of § 501(e) of the Internal Revenue Code of 1986, 26 U.S.C. § 501(e) (Code). Finding no clear error, we affirm the decision of the Tax Court.

## I. BACKGROUND

The salient facts are not in dispute. Appellants are three trust funds[1] that provide, through a board of trustees,

---

[1]Appellants Florida Hospital Trust Fund (Trust Fund A) and Florida Hospital Excess Trust Fund B (Trust Fund B) are organizations established under *Fla.Stat.* § 627.357(2)(a) (1994) to serve as medical malpractice risk management trust funds. Trust Fund A has twenty-three member hospitals. It provides insurance in favor of each of its members on a claims made basis

centralized, cooperative insurance services to their member hospitals through the employment of actuaries, risk managers, underwriters, accountants, and other insurance consultants. None of the member hospitals are related. By written agreement, member hospitals pool their resources reciprocally to self-insure, within certain limits, against hospital professional and workers' compensation liability. Under the terms of the two malpractice liability funds agreements, the member hospitals jointly and severally covenant and agree to pay the funds' obligations with the right of indemnity among the members for each member's pro-rata share of the obligation in accordance with a stated formula. Under the terms of the workers' compensation fund agreement, the member hospitals assume joint and several liability with respect to any lawful awards entered against another member by the Division of Workers' Compensation of the Florida Department of Labor and Employment Security. The funds' only assets consist of their

---

with coverage per member up to $250,000 per claim with an annual aggregate limit of one million dollars. Trust Fund B has twenty-six members. It provides to its members excess coverage on a claims made basis for coverage per member up to ten million dollars per claim with an annual aggregate limit of ten million dollars, in excess of a minimum retention of $250,000 per claim, and an annual aggregate retention of one million dollars. Both Trust Fund A and Trust Fund B are managed by a service agent and regulated by the Florida Department of Insurance. Each provide for the selection of a board of trustees to exercise the rights of the members. Appellant Florida Hospital Workers' Compensation Self-Insurance Fund (Trust Fund C) is an organization established under *Fla.Stat.* § 440.57 (1991) to serve as a group self insurer fund. Trust Fund C has thirty-one members and is regulated by the Florida Department of Labor and Security, Division of Workers' Compensation. Members of the three funds are either government-run hospitals within the meaning of I.R.C. § 501(e)(1)(B)(iii) or exempt charitable organizations described in I.R.C. § 501(c)(3). Neither the funds nor the member hospitals undertake to provide insurance to or for any entity other than a member hospital.

claims against member hospitals for their pro-rata share of fund obligations. Insurance for each hospital is provided by all, with the particular fund acting as agent for each. In practice, members submit annually, aggregate amounts comparable to premiums based upon an independent actuary's (or the National Council on Compensation Insurance's) projection of each funds' anticipated funding needs. Member payments—"premiums"—are later adjusted, resulting in either an additional assessment or a refund or credit, to reflect the particular trust fund's actual loss experience. Each of the funds derive all of its income from amounts received from member hospitals and investment income on such amounts. They retain no earnings, allocating or paying all net income if any back to member hospitals within eight and one-half months following the close of each taxable year.

In 1990, the trust funds submitted to the Commissioner of the Internal Revenue Service (Commissioner) applications for exemption from tax under I.R.C. § 501(c)(3) (Forms 1023). Two of the funds represented that their primary pose was to provide member hospitals with coverage for hospital professional liability and the third represented that its primary purpose was to provide workers' compensation coverage to its members. The Commissioner issued final adverse determination letters in 1992, denying the applications on the basis that the trust funds' activities were not covered by the list of exempt activities of cooperative hospital service organizations under I.R.C. § 501(e).[2]

---

[2]The Commissioner found:

> You are not a cooperative hospital service organization

After exhausting their administrative remedies, the trust funds filed petitions with the Tax Court seeking declaratory judgments under I.R.C. § 7428(a) that they were "cooperative hospital service organizations" under I.R.C. § 501(e) and therefore exempt from tax. Adjudicating the case on a stipulated administrative record, the Tax Court concluded they were not. Finding no clear error, we affirm.

## II. STANDARD OF REVIEW

The Tax Court's finding that these trust funds were not organized and operated exclusively for exempt purposes is one of fact, subject to a clearly erroneous standard of review; this standard is not altered by the existence of stipulated facts. *American Ass'n of Christian Schools Voluntary Employees Beneficiary Ass'n Welfare Plan Trust v. United States,* 850 F.2d 1510, 1513 (11th Cir.1988) (citing *Senior Citizens Stores, Inc. v. United States,* 602 F.2d 711, 713 (5th Cir.1979) and *Church by Mail, Inc. v. Commissioner,* 765 F.2d 1387, 1390 (9th Cir.1985)). We review *de novo,* however, the ultimate legal conclusion that the trust funds do not qualify for tax exempt status. *American Ass'n of Christian Schools,* 850 F.2d at 1513.

---

described in section 501(e) of the Code because you are not organized and operated solely to perform on a centralized basis one or more services described in section 501(e)(1)(A) for two or more exempt hospitals. Further, a substantial part of your activities consists of providing commercial-type insurance. Consequently, section 501(m) precludes your exemption as an organization described in section 501(c)(3). You are not operated exclusively for exempt purposes within the meaning of section 501(c)(3) of the Code. You are operated for a substantial non-exempt commercial purpose. Furthermore, you are a feeder organization within the meaning of section 502.

## III. DISCUSSION

Congress enacted I.R.C. § 501(e) in 1968. *See* Revenue and Expenditure Control Act of 1968, Pub.L. 90-364, § 109(a), 82 Stat. 269. It provides that a cooperative hospital service organization shall be treated as an organization organized and operated exclusively for charitable purposes pursuant to I.R.C. § 501(c)(3) if:

> (1) such organization is organized and operated solely—

> (A) to perform, on a centralized basis, one or more of the following services which, if performed on its own behalf by a hospital which is an organization described in subsection (c)(3) and exempt from taxation under subsection (a), would constitute activities in exercising or performing the purpose or function constituting the basis for its exemption: data processing, *purchasing,* warehousing, billing and collection, food, clinical, industrial engineering, laboratory, printing, communications, record center, and personnel (including selection, testing, training, and education of personnel) services; and

> (B) to perform such services solely for two or more hospitals each of which is—

> (i) an organization described in subsection (c)(3) which is exempt from taxation under subsection (a).... (Emphasis added).

In 1988, Congress amended I.R.C. § 501(e)(1)(A) to add the parenthetical phrase "(including the *purchasing of insurance on a group basis* )" after the word "purchasing" in the description of qualified exempt activities (emphasis added). *See* Technical and Miscellaneous Revenue Act of 1988, Pub.L. 100-647, § 6202(a), 102 Stat. 3730 (TAMRA '88).[3]

---

[3]Despite the seemingly broad general language of I.R.C. § 501(c)(3), I.R.C. § 501(e)(1)(A) is the exclusive list of the specific types of cooperative hospital service organizations that are encompassed within the scope of I.R.C. § 501 as charitable organizations. *HCSC-Laundry v. United States,* 450 U.S. 1, 4, 101 S.Ct. 836, 838, 67 L.Ed.2d 1 (1981) (a cooperative organization

The trust funds contend that the statute was amended in response to an overly restrictive position[4] being taken by the Commissioner, finding support for this position in the Congressional Conference Report to TAMRA '88:

> The provision *clarifies* that the *purchasing* activities that may be carried on by a tax-exempt hospital service organization include the *acquisition, on a group basis,* of insurance (such as *malpractice and general liability insurance*) for its hospital members. The provision applies to purchases made before, on, or after the date of enactment. (Emphasis added).

H.R.Rep. No. 1104, 100th Cong., 2d Sess. 209, 1988-3 C.B. 699.

The trust funds argue that this statutory language should be broadly construed as Congress was effectively interchanging the words "acquisition" or "providing" with the word "purchasing." The legislative history, they claim, broadens the scope of qualified insurance activities for I.R.C. § 501(e) purposes. They contend the amendment should be viewed in the historical setting of the late 1980's, when insurance coverage for hospitals in Florida was in a state of crisis, with no known method of acquiring primary or

---

established to provide laundry services for its member hospitals did not qualify for exempt status as laundry services were not among those listed in I.R.C. § 501(e)(1)(A)).

[4]The Commissioner issued G.C.M. 39122, CC: EE-36-82 (January 25, 1984), concluding that an organization formed by two closely related (but legally separate) hospitals for the purpose of providing malpractice and general comprehensive insurance on a self-insurance basis did not qualify for an exemption under I.R.C. § 501(c)(3) as the provision of various insurance services on a cooperative basis is not one of the specifically enumerated services permitted under I.R.C. § 501(e)(1)(A). *But see* Rev.Rul. 78-41, 1978-1 C.B. 148 (where a self-insurance trust created by a single exempt hospital for the sole purpose of accumulating and holding funds to be used to satisfy malpractice claims against the hospital, and from which the hospital directs the bank-trustee to make payments to claimants, was determined by the Commissioner to be operated exclusively for charitable purposes and exempt from tax under I.R.C. § 501(c)(3)).

excess professional liability insurance. To view the amendment to I.R.C. § 501(e)(1)(A) restrictively, the trust funds argue, would effectively nullify the parenthetical language added by TAMRA '88 and discriminate in favor of larger hospitals with the financial strength to self-insure on an in-house basis.

The Tax Court disagreed. Finding that the plain and ordinary meaning, *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 543-44, 60 S.Ct. 1059, 1063-64, 84 L.Ed. 1345 (1940), of the "fairly specific" statute should be construed narrowly, the Tax Court refused to view the terms "purchasing" and "providing" interchangeably. From its perspective, the plain meaning of the phrase "purchasing of insurance on a group basis" denotes a commercial transaction in which a cooperative hospital service organization negotiates and executes the purchase of insurance for its membership as a group.[5] The Tax Court found that "[f]ar from purchasing insurance, petitioners have assumed the role of insurer,"[6] extending insurance benefits in return for premiums received based on the risks involved—the same as those typically

---

[5]The trust funds contend that the effect of this interpretation is that a group insurance policy must be purchased from a licensed insurance carrier that would hold and own all reserves, provide all services, and collect all premiums, negating the need to create a separate entity known as a cooperative hospital service organization. This interpretation, the trust funds argue, is also incorrectly premised on the availability of such insurance in the marketplace.

[6]Commercial insurance companies do, themselves, insure, taking on the risks of loss in return for premiums. Here, the funds are set up so that they have no ultimate risk, having the right to enforced "contributions" from the member hospitals, pro-rata, to cover all losses and expenses. Indeed, even if one or more members should become insolvent, apparently each other member remains liable for the losses of any member, with a right of indemnity—perhaps a hollow right—against the insolvent ones.

provided by commercial insurance companies.[7]

From a public policy standpoint, we empathize with the trust funds' position. It does appear that the Tax Court's interpretation may inadvertently yet unfairly discriminate in favor of large tax-exempt and governmental hospitals or hospital systems with the advantage of in-house self-insurance while denying this method of acquiring insurance to small to mid-size hospitals. This is ironic given the stipulated fact that no commercial insurer carrier even wanted the smaller hospitals' business in the late 1980's. By definition, therefore, there can be no overriding anti-competitive concerns about the trust funds' operation in the insurance marketplace as a tax-exempt entity, enjoying an unfair advantage vis-a-vis their for-profit competitors.[8] Even so, however, we find no clear error in the Tax Court's finding of fact that these trust funds were not organized and operated exclusively for exempt purposes.

Strictly speaking, the member hospitals are not "*self*-insuring" themselves through these trusts. *See* Rev.Rul. 78-41, *supra* note 4. Neither are they "purchasing" insurance on a

---

[7]In the alternative, the Tax Court ruled that the services that the trust funds provided to the hospitals was that of providing "commercial-type insurance" under I.R.C. § 501(m), another reason to deny exemption. As we affirm the Tax Court's finding that the trust funds do not qualify for exemption under I.R.C. § 501(e)(1)(A), we do not reach this alternative holding.

[8]Code section 502, the feeder organization provision, was born of congressional concern that exempt organizations involved in otherwise commercial enterprises might enjoy an unfair competitive advantage over taxable businesses operating in the same industry. *See* Revenue Act of 1950, Pub.L. 814, § 301(b), 64 Stat. 953; S.Rept. 2375, 81st Cong., 2d Sess. 28-29, 35 (1950), 1950-2 C.B. 483, 504-505, 509.

group basis through these trusts.  What these member hospitals are doing is *providing insurance to each other, on a reciprocal basis,* using trust vehicles as their chosen method of operation.[9]  Each member insures—each is liable for the losses.  From a statutory construction standpoint, however, it is clear that included in I.R.C. § 501(e)(1)(A)'s list of exempt activities is the "*purchasing of insurance* on a group basis" and omitted from this list is the "*providing of insurance, reciprocally to each other,* on a group basis," *HCSC-Laundry v. United States,* 450 U.S. at 4, 101 S.Ct. at 838, and while we recognize the apparent need expressed in the position of the trust funds, we find that the law, as written, does not grant them tax-exempt status.  It is not the role or power of the judiciary to remedy a legislative statute by opinion.[10]  As

---

[9]The methodology employed here by the member hospitals is very similar to a rather antiquated risk spreading organization called a "reciprocal insurance exchange."  The reciprocal exchange idea was that each member agreed to pay its pro-rata share to cover the liabilities of any of the members who might suffer a loss through liability.  Several forms were created.  An "attorney-in-fact" would be appointed for the subscribers to the reciprocal exchange.  Each one of the members or subscribers would execute a document appointing the attorney-in-fact to act for it and to do the things that would accomplish the purpose of the funds.  That is, the attorney-in-fact would be instructed to collect from each subscriber a pro-rata amount based upon the risk and exposure of that member, and, hold it in a fund.  Whenever any reciprocal exchange member suffered a loss, the attorney-in-fact would investigate it, adjust it, defend it, and, either pay it off or defeat it.  The cost to do this was taken from the monies provided by the subscribers.  If the fund ran low, the attorney-in-fact was entitled to notify each member and each member would pay the pro-rata amount necessary to replenish the fund.  Here, the member hospitals, in creating their "trust funds," seem to have been aiming at this type of reciprocal exchange arrangement.

[10]We have great respect for Article I, Section 1 of the United States Constitution that confers the power to legislate upon the men and women of Congress.  It doesn't confer that power upon us, the judiciary, and it is inappropriate to patronize

the Supreme Court stated in *HCSC-Laundry,* at 8, 101 S.Ct. at 840, "Congress easily can change the statute whenever it is so inclined."

## IV. CONCLUSION

We affirm the decision of the Tax Court.

AFFIRMED.

---

Congress by noting their imperfect work and quietly correcting it. *Archer-Daniels-Midland Co. v. United States,* 37 F.3d 321, 324 (7th Cir.1994) (Hill, J., dissenting *dubitante* ). The judiciary should neither assume the responsibility nor usurp authority not delegated to it. *Roberts v. Austin,* 632 F.2d 1202, 1215 (5th Cir.1980) (Hill, J., concurring specially), *cert. denied,* 454 U.S. 975, 102 S.Ct. 527, 70 L.Ed.2d 395 (1981).