802 F.Supp. 120 (1992)
STATE OF MICHIGAN, and its Michigan Education Trust, Plaintiffs,
v.
UNITED STATES of America, Defendant.
No. 5:90-CV-35.
United States District Court, W.D. Michigan, S.D.
July 28, 1992.
*121 Lawrence D. Owen, William J. Danhof, Miller, Canfield, Paddock & Stone, Terrence P. Grady, Asst. Atty. Gen., Frank J. Kelley, Atty. Gen., Finance & Development Div., Lansing, Mich., for plaintiffs.
Daniel M. LaVille, John A. Smietanka, U.S. Attys., Grand Rapids, Mich., Donald J. Gavin, Litigation Counsel, U.S. Dept. of Justice, Tax Div., Washington, D.C., for defendant.
OPINION DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
HILLMAN, Senior District Judge.

I. Introduction.

The State of Michigan and the Michigan Education Trust (the "Trust" or the "MET") have sued the United States for refund of taxes assessed against income earned by the Trust. They seek the refund under several theories: (1) The Internal Revenue Code ("the Code") does not apply to the Trust because the Trust is part of the State of Michigan; (2) Code Section 115(1), 26 U.S.C. § 115(1) exempts the Trust's income from taxation; (3) The Trust qualifies as a tax-exempt organization under Code Sections 501(c)(3) and 501(c)(4), 26 U.S.C. §§ 501(c)(3) and 501(c)(4); (4) The doctrine of intergovernmental tax immunity prohibits the tax; (5) The Tenth Amendment to the United States Constitution bars imposition of the tax; and (6) The Guarantee Clause of the United States Constitution bars imposition of the tax. Presently before the court are the parties' cross-motions for summary judgment.

II. Facts.

The case comes before the court on stipulated facts. The basic facts are as follows.
On December 23, 1986, the Governor of the State of Michigan signed into law the Michigan Education Trust Act (the "Act"), 1986 P.A. 316, M.C.L.A. § 390.1421 et seq.; M.S.A. § 15.2097(421). The Act establishes *122 and governs the Michigan Education Trust (the "MET" or the "Trust") as a mechanism for helping parents (or "purchasers") finance their children's ("beneficiaries'") college education. Pursuant to contract between purchasers and the Trust, purchasers invest in the Trust by paying certain actuarially determined amounts. The Trust invests the money it receives. In exchange, the Trust guarantees the college tuition of the beneficiaries at a Michigan State-operated college or university. If a beneficiary attends a private university or an out-of-state university the Trust pays the private or out-of-state institution an amount based on the tuition at Michigan's public institutions of higher learning.
In certain situations, the beneficiary or the beneficiary's estate receives the benefit directly. This occurs if the beneficiary dies or becomes disabled, if the beneficiary does not attend college, or if the beneficiary attends an out-of-state or private institution but does not authorize payment of the benefit directly to the institution. In addition, should the Trust become actuarially unsound, it will be dissolved, and its assets paid out to its investors on a pro-rata basis.
An independent board of directors administers the Trust. The board consists of the State Treasurer and eight other members appointed by the Governor with the advice and consent of Michigan's Senate. The board has the power, among other powers, (1) to invest the money of the Trust in any instruments, obligations, security, or property; (2) to pay money from the Trust to state institutions of higher education; (3) to impose reasonable residency requirements for qualified beneficiaries; (4) to contract for goods and services and engage personnel as is necessary; (5) to enter into contracts on behalf of the State; (6) to define the terms and conditions under which money may be withdrawn from the Trust, including, but not limited to, reasonable charges and fees for any such withdrawal, if the terms and conditions are made a part of the contract; (7) to establish policies, procedures, and eligibility criteria to implement the Act; and (8) to indemnify or procure insurance indemnifying any member of the board from liability resulting from a member's conduct as a member of the board. In addition, the Act expressly authorizes the Trust to contract, on behalf of itself or the State, for the provision of services.
The Trust is within the Department of Treasury and its investments are made by employees of Michigan's Department of the Treasury. However, the Trust exercises its powers independently of the head of the Department of Treasury. While the Trust's funds may be pooled with funds belonging to the State for investment purposes, the Act otherwise segregates the Trust's funds; the funds are to be used solely for the purposes of the Trust and may not be used by the State for any purposes. The Act provides that the Trust's assets shall not be considered state money, common cash of the state, revenue for the purposes of sections 26 to 34 of article IX of the state Constitution, nor state money for the purposes of the statute requiring the state treasurer to pay obligations of the state from "state money." The State may, but is not required to, appropriate funds to make up any financial shortfall if the Trust becomes actuarially unsound. Should the Trust be dissolved, any excess funds in the Trust go into the general treasury of the State.
The Michigan Legislature made specific findings and declarations with regard to the need for the Act. These include: (1) that it is an essential function of state government to encourage schools and the means of education, and to encourage attendance at state institutions of higher education; and (2) that it is in the best interest of the people of the state to foster public higher education, to encourage state residents to enroll at state institutions of higher education, to enhance and foster the ability of Michigan residents to choose an independent, nonprofit higher education and to encourage state residents desiring an independent higher education to enroll in an independent institution of higher learning within the state.
The Act subjects the Trust to certain regulations. The form of the Trust's advance tuition payment contracts must receive *123 approval from the state administrative board, which is composed of certain officers of the state, and is headed by the Governor. The Trust's board of directors must conduct its business in compliance with Michigan's Open Meetings Act. Writings used by the Trust's board of directors are subject to Michigan's Freedom of Information Act. The Trust's employees are included within the state classified civil service and are subject to rules and regulations of the state Civil Service Commission. The board of directors is required to submit an annual accounting of the Trust to the Governor and political leaders of the Michigan legislature. The accounts of the board are subject to annual audits by the state auditor general or a certified public accountant appointed by the auditor general. The board of directors is required to conduct an annual actuarial evaluation of the Trust, and to adjust payments of subsequent purchasers of Trust contracts to ensure the Trust's actuarial soundness.
The Act also required the state to solicit rulings from the Securities and Exchange Commission regarding the application of federal securities law to the Trust. The Trust obtained these rulings. Finally, the Act prohibited the Trust from entering into any advance tuition contracts until the Internal Revenue Service ("IRS") issued a favorable ruling that the purchaser of the contract would not be considered actually or constructively in receipt of income. The Trust obtained this favorable ruling from the IRS.
The IRS's ruling also included a holding that the Trust was not tax exempt under the Code. The Trust filed U.S. Corporation income tax returns for the 1987-88, 1988-89, and 1989-90 tax years, reporting total taxes of $15,830,704. On July 28, 1988, the Trust filed an Application for Recognition of Exemption under Code Section 501(c)(3). On April 26, 1989, the IRS issued a letter ruling denying the Trust's claim to tax-exempt status under Section 501(c)(3). On August 8, 1989, the IRS issued a final adverse ruling on the Trust's application for tax exempt status under Section 501(c)(3).

III. Jurisdiction.

The court has jurisdiction over the matter pursuant to 28 U.S.C. Sections 1331, 1340, and 1346(a)(1).

IV. Analysis.

The parties present issues of both Constitutional and statutory interpretation. I begin with the statutory claims.

1. Statutory Claims.

Applicability of the Internal Revenue Code.
Michigan claims, initially, that the MET is not subject to the Code because the Code is not intended to apply to states or their instrumentalities.
This argument fails because MET is not an integral part of the State of Michigan. The Code does not contain any provision expressly stating that it does not apply to states. Rather, states have de facto exemption from the Code because the Code, by its terms, applies only to individuals and entities such as corporations. Congress never intended the Code to apply to the states. See generally D. Richardson, Federal Income Taxation of States, 19 Stetson L.Rev. 411 (1990). Whatever its relationship to the State, the MET is a corporation to which the Code, by its terms, applies. The question, then, is whether the MET is also an integral part of the State of Michigan entitled to the State's de facto immunity.
I conclude that the MET is not an integral part of the State of Michigan. While the MET received its start-up funds from the State, the funds out of which it provides its tuition-guaranteeing service come from contracts with private individuals, not from the State. The State may not use MET's funds to pay creditors of the state, nor may the state use the MET's funds for any other purposes. M.C.L.A. § 390.1429(2); M.S.A. § 15.2097(429)(2). M.C.L.A. § 390.1437; M.S.A. § 15.2097(437). Conversely, while the Act provides that MET may contract with subscribers "on behalf of itself and the state," *124 it was conceded at oral argument that Michigan does not back up those contracts with its full faith and credit. These facts all demonstrate that MET is an entity distinct from the State. Therefore, the MET is subject to the Code.

Exemption from Gross Income under Section 115.
Section 115 of the Code does not exempt the MET's income from taxation. That provision states:
Gross income does not include
(1) income derived from ... the exercise of any essential governmental function and accruing to a State or any political subdivision thereof....
26 U.S.C. § 115(1).
It can be argued that the quoted portion of Section 115 does not apply to any entities other than states or their political subdivisions. See D. Richardson, Federal Income Taxation of States, 19 Stetson L.Rev. 411, 503 (1990). Under that approach, the court's determination that the MET is not an integral part of the state would settle the question of whether Section 115 alters the MET's tax status: it can't. However, courts have often applied Section 115 to determine the tax status of entities other than states or their political subdivisions. See, e.g., Maryland Savings-Share Insurance Corporation v. United States, 308 F.Supp. 761 (D.Md.1970) (non-profit corporation established by state for insuring deposits of member savings and loan associations), rev'd on other grounds, 400 U.S. 4, 91 S.Ct. 16, 27 L.Ed.2d 4 (1970) (but expressly approving district court's application of Section 115); City of Bethel v. United States, 594 F.2d 1301, 1302-03 (9th Cir.) (city-run liquor store), cert. denied, 444 U.S. 980, 100 S.Ct. 482, 62 L.Ed.2d 407 (1979).
But whatever approach the court uses, the result is the same. Under the first approach, Section 115 offers the MET no help because Section 115 cannot apply to the MET. Under the second approach, applying Section 115, Section 115 does not alter the MET's tax status because, as discussed below, that provision's accrual requirement is lacking.
Income "accrues" to a state for purposes of Section 115 when some kind of actual or bookkeeping transfer of funds occurs. City of Woodway v. United States, 681 F.2d 975, 980 (5th Cir.1982); City of Bethel, 594 F.2d at 1303. That is, a state or political subdivision of a state must have a "vested right" or an "enforceable claim" to the income. Omaha Public Power District v. O'Malley, 232 F.2d 805, 809 (8th Cir.), cert. denied, 352 U.S. 837, 77 S.Ct. 57, 1 L.Ed.2d 55 (1956); Troy State Univ. v. Commissioner, 62 T.C. 493, 497 (1974).
The Act provides that Michigan has no claim to MET's assets, including the investment income. As noted above, MET's funds may not be considered "common cash" of the state, nor may they be considered "state money." Michigan may not use the money to pay the obligations of the state. No actual or bookkeeping transfer of funds to the state occurs. The only situation in which Michigan would have any such vested right would occur in the event that the Trust were dissolved because of actuarial unsoundness and assets were left over after paying creditors and distributing pro rata benefits to subscribers. In short, Michigan presently has no "vested right" or "enforceable claim" to MET's investment income. In the language of the Code, MET's income does not "accrue" to the state. Therefore, Section 115 does not provide an exemption for MET's income.
Exemption under Sections 501(c)(3) and (c)(4).
The Code provides for exemption from taxation for certain organizations. These include organizations
organized and operated exclusively for ... charitable ... or educational purposes, ... no part of the net earnings of which inures to the benefit of any private shareholder or individual....
26 U.S.C. § 501(c)(3). The Code also exempts *125 organizations not organized for profit but operated exclusively for the promotion of social welfare....
26 U.S.C. § 501(c)(4).
The parties agree that the presence of any substantial non-exempt purpose will destroy an organization's exemption, regardless of the number and importance of truly exempt purposes. See, e.g., Ohio Teamsters Educ. and Safety Training Trust Fund v. Commissioner of Internal Revenue, 692 F.2d 432, 435-36 (6th Cir. 1982). See also Better Business Bureau v. United States, 326 U.S. 279, 283, 66 S.Ct. 112, 114, 90 L.Ed. 67 (1945). Their difference lies primarily in whether the Trust's purpose of providing the tuition-guaranteeing service constitutes an exempt purpose, as claimed by the Trust, or a substantial private purpose, as claimed by the United States.
The Trust adheres to the view that the private benefits enjoyed by the purchasers of MET contracts are incidental to the broader public benefits gained by society at large in the form of a well-educated populace. In my view, the Trust's purpose of providing the tuition guaranteeing service constitutes a substantial private purpose that destroys the Trust's exemption. I arrive at this conclusion primarily because the Trust's sole direct benefit inures only to individuals who purchase contracts. See Contracting Plumbers Coop. Restoration Corp. v. United States, 488 F.2d 684, 687 (2d Cir.) (private economic interests of cooperative formed to repair damage to public streets by its paying members, while not repairing damage caused by non-members, held to constitute a non-exempt purpose), cert. denied, 419 U.S. 827, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974); American Ass'n of Christian Sch. Voluntary Emp. Beneficiary Ass'n Welfare Plan Trust v. United States, 850 F.2d 1510, 1513, 1516 (11th Cir.1988) (substantial non-exempt purpose of providing insurance in exchange for premiums received destroys exemption under Sections 501(c)(3) and (4)); Police Benev. Ass'n of Richmond, Virginia v. United States, 661 F.Supp. 765, 771-73 (E.D.Va.) (fund served substantial non-exempt purposes under Sections 501(c)(3) and (4) where it provided substantial financial benefits to dues-paying members, and provided no such benefits to non-members), aff'd without op., 836 F.2d 547 (4th Cir 1987). See also Geisinger Health Plan v. Commissioner of Internal Revenue, T.C. Memo. 1991-649 (December 30, 1991) (health plan's subsidized dues program for persons who wanted membership but could not afford payments supported conclusion that plan did not operate for private benefit of its subscribers).
Accordingly, I conclude that MET does not qualify for exemption under Sections 501(c)(3) and 501(c)(4) of the Code.

2. Constitutional Claims.

Intergovernmental Tax Immunity.
The doctrine that the states are constitutionally immune from federal taxation arises from the constitutional structure and a concern for protecting state sovereignty. South Carolina v. Baker, 485 U.S. 505, 518 n. 11, 108 S.Ct. 1355, 1364 n. 11, 99 L.Ed.2d 592 (1988). It addresses two principal concerns. One concern is whether the United States can ever impose a tax directly on the states or on parties with whom the states deal. The other concern is that, even though the federal government could legitimately tax a state or another entity that deals with a state, a particular imposition of such a tax might have the effect of discriminating against the states in favor of the federal government, upsetting the constitutional scheme of a union composed of sovereign states.
Under current intergovernmental tax immunity doctrine, the United States can tax any private parties with whom a state does business, even though the financial burden falls on the state, so long as the tax does not discriminate against the state, or those with whom it deals, in favor of the federal government. South Carolina v. Baker, 485 U.S. at 523, 108 S.Ct. at 1366. In addition, at least some non-discriminatory federal taxes can be collected directly from the states even though a parallel state tax could not be collected directly from the federal government. Id. A tax is considered *126 to be directly "on" the state only when the levy falls on the state itself, "or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities." Id., 485 U.S. at 519 n. 11, 523, 108 S.Ct. at 1364 n. 11, 1366 (quoting United States v. New Mexico, 455 U.S. 720, 735, 102 S.Ct. 1373, 1383, 71 L.Ed.2d 580 (1981)).
Stating the doctrine in this way, in light of this court's earlier determination that the Trust is not an integral part of the state, disposes of the issue of whether the Trust could ever legitimately be subject to federal taxation. The Trust's status as an entity established by the State of Michigan does not implicate the doctrine because the Trust is not so closely connected to the State that the two cannot realistically be viewed as separate entities.
The discrimination issue of the doctrine of inter-governmental tax immunity is somewhat more problematic. The parties' dispute on this issue centers on which other entities constitute the appropriate standards of comparison by which to measure the alleged discrimination. The State and the Trust contend that the court should compare the IRS's tax treatment of the Trust with the IRS's tax treatment of a variety of federal and state agencies. The United States argues that the comparison should be with other providers of investment services, such as banks.
On this threshold issue, neither side presents an entirely correct approach. The comparison should beas argued by the Trust  with entities that deal with the federal government, as the discrimination aspect of the doctrine is concerned with ensuring that parties that deal with states receive the same treatment as those that deal with the federal government. See Davis v. Michigan Dept. of Treasury, 489 U.S. 803, 816-17, 109 S.Ct. 1500, 1508-09, 103 L.Ed.2d 891 (1989). But the United States is correct to the extent that it asserts that the comparison group should be limited to other providers of investment services, as the doctrine does not protect against differing tax treatment of two classes that differ in "significant" respects. Id., 489 U.S. at 815-16, 109 S.Ct. at 1507-08. Thus, the comparison group should consist  if any such entities can be found  of entities created by the federal government that provide some sort of investment service similar to that which the Trust provides.
None of the federally-created entities and programs identified by the Trust are sufficiently similar to the Trust to implicate the discrimination aspect of the doctrine of intergovernmental tax immunity. The Trust relies primarily on comparisons to four types of federal programs to establish that it has received discriminatory tax treatment. Those programs include the Robert T. Stafford Student Loan Program, 20 U.S.C. Section 1071, et seq.; federal mortgage insurance programs; the Federal Deposit Insurance Corporation, 12 U.S.C. Section 1811 et seq.; and the United States Postal Service, 39 U.S.C. Section 101 et seq. Each of these programs permits investment of funds to support the goals of the program. But each of the programs differs substantially from MET in that the federal programs do not function primarily  as does the Trust  as an investment service for their individual beneficiaries. Thus, the differing tax treatment accorded those programs does not offend the doctrine of intergovernmental tax immunity.
The Tenth Amendment.
The Trust argues that the Tenth Amendment to the United States Constitution bars imposition of the tax. The Amendment states that:
The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.
The Amendment sets "structural" limits  rather than substantive limits  on Congress' authority to regulate state activities. South Carolina v. Baker, 485 U.S. at 512, 108 S.Ct. at 1360 (citing Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985)). As a result, "[s]tates must find their protection from congressional regulation through the national political process, not through judicially defined *127 spheres of unregulable state activity." Id. In other words, the structure of our system of government, with each state having representation in Congress, assures the states that their interests will receive protection from an overbearing federal government. The courts may not use the Tenth Amendment to strike a federal regulation on the basis of the regulation's content.
But exceptions to this rule exist. First, "some extraordinary defects in the national political process might render congressional regulation of state activities invalid under the Tenth Amendment." Id. Second, Congressional interference with concerns that are "fundamental" or "essential" to States as sovereigns, such as determining the qualifications of their officers, implicates the Tenth Amendment. Gregory v. Ashcroft, ___ U.S. ___, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991).
With this understanding of the Tenth Amendment, even if the Trust could establish that it is sufficiently connected to the state to bring the Amendment's considerations into play, the court could not use the Amendment to invalidate the statute. The Trust does not establish that an extraordinary defect in the national political process led to the passage of the Code. Nor does imposition of the tax interfere with core concerns fundamentally relating to the State of Michigan as a sovereign. As a result, the Trust and the State of Michigan must seek protection in Congress, not in this court.
The Guarantee Clause.
The Trust challenges the tax on the ground that it violates the Guarantee Clause of the United States Constitution. The Guarantee Clause states that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government...." U.S. Const. Art. IV, § 4.
A long line of Supreme Court cases holds that the Guarantee Clause does not provide judicially manageable standards and is therefore nonjusticiable. See Luther v. Borden, 48 U.S. (7 How.) 1, 42, 12 L.Ed. 581 (1849); Baker v. Carr, 369 U.S. 186, 218-32, 82 S.Ct. 691, 710-18, 7 L.Ed.2d 663 (1962), on remand, 206 F.Supp. 341 (M.D.Tenn.1962). Despite this mandatory authority, the Trust urges the court to follow one of the dissents in South Carolina v. Baker, in which Justice O'Connor argued that judicial enforcement of the Guarantee Clause is proper. See South Carolina v. Baker, 485 U.S. at 531-34, 108 S.Ct. at 1371 (O'Connor, J., dissenting). The court declines to do so.

V. Conclusion,

In sum, the Code applies to the Trust because the Trust is not an integral part of the State of Michigan. Section 115 of the Code does not exempt the Trust's income from taxation, because the income does not accrue to the State of Michigan or one of its political subdivisions. The Trust does not qualify as a tax-exempt organization under Sections 501(c)(3) and 501(c)(4) of the Code because its purpose of providing the tuition-guaranteeing service constitutes a substantial private benefit that destroys the exemption.
Nor can the Trust find protection in the United States Constitution. Because the Trust is not so closely connected with the State of Michigan that the two cannot realistically be viewed as separate entities, the Trust is not immune from taxation under the doctrine of intergovernmental immunity. Moreover, the taxation of the Trust does not discriminate against the State in favor of the federal government. The Tenth Amendment offers the Trust no protection from imposition of the tax because that Amendment's protections derive from the structure of the Constitution rather than from judicially defined spheres of unregulable State activity. Finally, mandatory authority constrains this court to conclude that the Guarantee Clause provides no judicially manageable standards by which to determine whether imposition of the tax denies the State of Michigan its republican form of government.
Accordingly, the court denies the motion for summary judgment filed by the State of Michigan and the Trust, and grants the *128 United States' motion for summary judgment.