T.C. Memo. 2013-193

UNITED STATES TAX COURT

CAPITAL GYMNASTICS BOOSTER CLUB, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5819-09X.                    Filed August 26, 2013.

P is a gymnastics booster club. In June 1988 the IRS granted
P's request to be recognized as exempt from Federal income tax
under I.R.C. sec. 501(c)(3) as an organization fostering amateur
sports competition. In its fiscal year ending June 30, 2003, P's
members were parents of young athletes from approximately 240
families. The athletes were all on teams from one local private gym,
to which each family individually paid tuition and other fees. These
teams competed in meets, which required substantial additional funds
that P collected and administered. Membership in P was mandatory
for the parents of athletes who wanted to participate on the teams that
were operated out of that private gym, and each family paid to P an
annual assessment to cover the athlete's entry fees to compete in the
meets and to offset the estimated expenditures for the coaches' travel.
The assessment ranged from $600 to $1,400 per athlete for FY 2003,
depending on the athlete's competitive level.

[*2]   A family could satisfy its athlete's assessment either by paying cash or by participating in P's fundraising program.  The amount that an athlete's family raised was credited against his assessment.  About 46% of the families engaged in fundraising in FY 2003.  This fundraising generated a net profit of $35,326.  P used 93% of that profit to reduce the assessment on average by 50 to 70% for the families that fundraised.  P did not credit any of this profit against the assessments of the athletes whose families did not fundraise.

R examined P's operations for FY 2003 and determined that it was not operated exclusively for tax-exempt purposes under I.R.C. sec. 501(c)(3).  P petitioned for a declaratory judgment under I.R.C. sec. 7428(a).

Held:  R's final adverse determination is sustained because P was not operated exclusively for exempt purposes within the meaning of I.R.C. sec. 501(c)(3).  P's net earnings inured to the benefit of its fundraising parent members, and it conferred substantial private benefit on children of those fundraising families.

David B. Friedel, for petitioner.

Robin Williams Denick and Joseph W. Spires, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, Judge:  On December 1, 2008, the Internal Revenue Service (IRS) issued to Capital Gymnastics Booster Club, Inc. ("Capital Gymnastics"), a final adverse determination letter, which determined that, for "Tax Years Ending:

**[*3]** June 30, 2003 and all subsequent years", Capital Gymnastics was no longer exempt from Federal income tax under section 501(a).[1] Capital Gymnastics challenged the determination by timely petitioning this Court for declaratory judgment pursuant to section 7428(a). The issue to be decided is whether Capital Gymnastics satisfied the requirements of section 501(c)(3) and therefore qualified for exemption from tax under section 501(a).

For the reasons explained below, we find that Capital Gymnastics' earnings inured to the benefit of some of its athletes' parents in violation of section 501(c)(3), and that Capital Gymnastics had the substantial non-exempt purpose of furthering the private interests of those athletes. We therefore deny Capital Gymnastics' request for a declaratory judgment and sustain the IRS's final adverse determination.

FINDINGS OF FACT

Capital Gymnastics

In March 1987 Capital Gymnastics was organized in Virginia as a nonstock corporation for the purpose of "fostering national and international sports

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code ("the Code", 26 U.S.C.) as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*4] competition, within the meaning of Section 501(c)(3)". In June 1988 the IRS granted Capital Gymnastics' request for recognition of tax-exempt status.

By the fiscal year ended June 30, 2003 ("FY 2003"), Capital Gymnastics had approximately 240 member families. However, Capital Gymnastics is a booster club, not a training facility, and it owns no facilities or equipment. As of June 2003 its only asset was a bank account with a $27,192 balance.

By 2003 the number of local clubs that offered competitive gymnastics teams had dwindled to two or three, with the largest remaining boys program being offered at the Capital Gymnastics National Training Center ("the Training Center")--an entity that has a name similar to petitioner's but that is distinct from petitioner.

The Training Center[2]

The Training Center is a private, for-profit corporation in Virginia. In FY 2003 the Training Center trained amateur athletes from ages 6 through 18 in gymnastics and tumbling and placed them on teams according to age, ability, and sex. All of Capital Gymnastics' athletes trained at the Training Center; and

---

[2]The Training Center's status is not at issue in this case, and the Commissioner does not contend that Capital Gymnastics operated for the benefit of the for-profit Training Center in a manner that affects Capital Gymnastics' entitlement to tax-exempt status.

**[*5]** membership in Capital Gymnastics was mandatory for the parents of athletes who trained for competition at the Training Center.

Tuition, fees, and expenses

Each athlete's family paid tuition directly to the Training Center, ranging in FY 2003 from $200 per month for the youngest age groups to $330 per month for the oldest age groups. The families also paid to third parties (not to the Training Center or Capital Gymnastics) other expenses, such as national dues, a registration fee of $100, the cost of specialized equipment such as grips and official gym uniforms, and the expenses of travel to gymnastics meets, including airline tickets, hotels, and restaurants for the athletes (and for their parents if they chose to attend the meets). These amounts, however, did not cover the cost of competitions themselves, and Capital Gymnastics was operated to address those separate costs.

Capital Gymnastics dues and assessments

Parents were responsible for two separate fees payable directly to Capital Gymnastics: (1) an annual dues payment of $40 to offset Capital Gymnastics' nominal operating expenses such as annual corporate fees, insurance premiums, and production costs for the organization's annual handbook, and (2) an assessment of $600 to $1,400 per year per child to pay each athlete's competition

[*6] costs.[3]  This assessment covered the athlete's estimated meet entry fees and the coaches' travel costs (including transportation, lodging, and meals). Participation in competitions varied by interest, age, and skill, with meets held locally, in nearby States, nationally, and internationally.  Capital Gymnastics computed the assessment at the beginning of each season by consulting with meet sponsors.  Capital Gymnastics did not allow athletes to compete unless their assessment was paid in full, including any late fees.  The record shows no conferring of "scholarships" nor any other relaxation of this requirement.

Capital Gymnastics' fundraising

The parties have stipulated that "Capital Gymnastics' primary function was to raise funds".  A parent could simply pay his child's assessment in cash; but

---

[3]Capital Gymnastics acknowledges the possibility "that some of the Booster Club's members might attempt to deduct their dues or assessment payments, arguing those are payments to a tax-exempt organization"; but we see nothing in the record to suggest that Capital Gymnastics facilitated such deductions (e.g., by issuing donation receipts) or to contradict Capital Gymnastics' assertion that "we have consistently maintained that members should not deduct those payments, and that is the clear and consistent position we have stated whenever asked." However, while it is true that a parent-member who pays his assessment in cash apparently does so out of after-tax dollars, it is also true that a fundraising parent-member earns "points" on which he pays no tax and then satisfies his assessment with those before-tax earnings.  It could therefore be said that Capital Gymnastics distributes money that escapes taxation; but since the Commissioner did not raise this issue, we do not base our decision on it.

**[*7]** Capital Gymnastics also gave member-parents the option to voluntarily fundraise[4] to offset the assessment amount. Capital Gymnastics' fundraisers included selling wrapping paper, discount cards, cookie dough, candles, ornaments, and "scrip" (explained below).

Scrip, as used by Capital Gymnastics, involved a merchant who wanted to support Capital Gymnastics and would allow the organization to purchase, at a discount, certificates that bore the merchant's name and that the merchant would honor for purchases. For example, Capital Gymnastics might purchase from a grocery store a number of $100 certificates for $95 each. (The capital required for this scrip program was thus considerable, apparently amounting to more than $180,000 in FY 2003.) Members would then buy the certificates from Capital Gymnastics at the full face value ($100) and could redeem the certificate at the store to purchase $100 worth of groceries. A member's purchase of scrip therefore generated a fundraising profit equal to the merchant's discount, $5 in this example. A member who purchased scrip of $100 (and who would otherwise have purchased $100 worth of groceries without scrip) thus generated $5 for Capital

---

[4]The parties stipulate that "families" engaged in fundraising and that "[p]arents and athletes are collectively referred to [as] 'families.'" However, they also stipulate that the assessment that might be satisfied by fundraising was the responsibility of the parent-member, not the child-athlete.

[*8] Gymnastics at no real cost to himself. More than one-fourth of Capital Gymnastics' fundraising profit in FY 2003 arose from sales of scrip, and virtually all of those scrip sales were to Capital Gymnastics members. Merchants were willing to grant these discounts and support Capital Gymnastics only if it was a tax-exempt charitable organization.

A portion of Capital Gymnastics' other fundraising activities occurred on sidewalks in front of grocery stores and other retail establishments. The fundraisers displayed Capital Gymnastics signs and banners at the fundraising events. The families gained permission to fundraise from the merchants or property managers by presenting documentation of Capital Gymnastics' tax-exempt status.

For the families that chose to fundraise, Capital Gymnastics awarded points in proportion to the fundraising profit that each family generated. Each point was worth $10. The chairperson of each fundraiser also received a small number of points as an incentive to manage the fundraisers. Parents could earn additional points by filling certain board positions on Capital Gymnastics. Capital Gymnastics' financial manager periodically tallied the points for each family and reduced the family's unpaid assessment in dollars, according to the number of points that the family had earned.

**[*9]**   If a balance due remained for any family who had fundraised, the family paid the balance of their assessment by writing a check payable to Capital Gymnastics. If a fundraising family generated more points than they needed for the year, then they carried over the excess to be applied to the following year's assessment. If a family discontinued membership, the family forfeited any excess points, and Capital Gymnastics applied the excess dollars to the organization's general fund.

Parents who did not participate in the fundraising--slightly more than half of the families--did not receive a benefit from the fundraising activities of the other parents. Rather, families who did not fundraise wrote checks to Capital Gymnastics for their full assessment amount.

This allocation of fundraising benefit solely to fundraising families was conscious and deliberate, since Capital Gymnastics explicitly prevented those it called "freeloaders" or "moochers" from benefiting from the fundraising activity of others.

FY 2003 financial results

For FY 2003, about 110 families (i.e., approximately 46% of the 240 member families) participated in fundraising. The fundraising yielded a net profit $35,326. Capital Gymnastics awarded $32,920 of the net profit, or approximately

[*10] 93%, to families that participated in the fundraising or who filled board positions, leaving $2,406 or 7% of the fundraising profit for use by the entire organization. Families who fundraised were able to offset on average 50% to 70% of their assessment for the year.

Besides the fundraising profit of $35,326, Capital Gymnastics' only other source of income for FY 2003 was $81,186 from membership dues and assessments that the fundraising did not offset. Accordingly, Capital Gymnastics' total net revenue for FY 2003 was $116,512.

Capital Gymnastics incurred total expenses of $130,610 for FY 2003, consisting of $115,394 in competition-related expenses and $15,216 in operating expenses. Consequently, for FY 2003 Capital Gymnastics generated a loss of $14,096, which the organization funded by reducing its bank account balance to $27,192 by fiscal yearend.

IRS action

Beginning in 2005 the IRS examined Capital Gymnastics' returns for its FY 2003 to determine whether Capital Gymnastics operated in the manner stated in its application for recognition of tax exemption. After completing the examination, the IRS sent to Capital Gymnastics a letter dated October 6, 2006, stating the agency's determination to revoke its recognition of the organization's

**[*11]** tax-exempt status. Capital Gymnastics appealed that determination within the IRS. The IRS Office of Appeals issued to Capital Gymnastics a final adverse determination letter dated December 1, 2008. The letter stated that Capital Gymnastics had failed to establish that its income "did not inure to the benefit of private individuals and shareholders, which is prohibited by I.R.C. § 501(c)(3). You are operated for a substantial private purpose, which is prohibited by Internal Revenue Code section 501(c)(3)." As a result, the IRS revoked its recognition of the organization's tax-exempt status under section 501(a), beginning with FY 2003.

Capital Gymnastics timely petitioned this Court, seeking a declaratory judgment under section 7428 that would reverse the IRS's final adverse determination. At the time it filed its petition, Capital Gymnastics maintained its principal place of business in Virginia.

OPINION

I.  General legal principles

A.  Tax exemption

Section 501(a) provides in pertinent part that an organization "shall be exempt from taxation" if the organization is of a type that section 501(c) describes. Section 501(c) in turn lists types of organizations that are exempt from tax,

[*12] including those described in section 501(c)(3). Failure to satisfy any of the requirements of section 501(c)(3) disqualifies an organization from being tax exempt under that section. <u>Columbia Park & Recreation Ass'n, Inc. v. Commissioner</u>, 88 T.C. 1, 13 (1987), <u>aff'd without published opinion</u>, 838 F.2d 465 (4th Cir. 1988).

### 1. Tax-exempt purposes

Section 501(c)(3) confers tax exemption on organizations with certain specified charitable "purposes":

> Corporations, and any community chest, fund or foundation, <u>organized and operated exclusively</u> for religious, charitable, scientific, testing for public safety, literary, or education purposes, or <u>to foster national or international amateur sports competition</u> (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, <u>no part of the net earnings of which inures to the benefit of any private shareholder or individual</u>, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office. [Emphasis added.]

The purposes that qualify for tax-exempt status under section 501(c)(3) thus include, as quoted above, "foster[ing] national or international amateur sports competition".

**[*13]**  2.  <u>Organized and operated</u>

In order to be described in section 501(c)(3), an organization must be both "organized and operated exclusively[5] for" certain specified exempt "purposes". The Commissioner does not dispute that Capital Gymnastics is <u>organized</u> exclusively for exempt purposes (since its organizing documents do not fail to so state), <u>see</u> 26 C.F.R. sec. 1.501(c)(3)-1(b), Income Tax Regs., but instead maintains that Capital Gymnastics failed to <u>operate</u> exclusively for exempt purposes (a requirement that calls for an examination of its actual operations).

  3.  <u>Private inurement and private benefit</u>

Section 501(c)(3) provides that, in order for an organization to qualify as tax-exempt, "no part of the net earnings[6] of * * * [the organization may] inure[]

---

[5]26 C.F.R. section 1.501(c)(3)-1(c)(1), Income Tax Regs., provides:  "An organization will be regarded as operated <u>exclusively</u> for one or more exempt purposes only if it engages <u>primarily</u> in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3).  An organization will not be so regarded if <u>more than an insubstantial</u> part of its activities is not in furtherance of an exempt purpose."  (Emphasis added.)  That is, under the statute the exempt purposes must be "exclusive", but the regulation provides that an organization may be tax exempt even if its operations include activities in furtherance of <u>non</u>-exempt purposes, provided that those activities are "insubstantial".  Capital Gymnastics' fundraising was its admitted "primary function", and its non-exempt purposes furthered by that function are very substantial.

[6]Capital Gymnastics correctly states that prohibited inurement may include "excessive compensation", thereby perhaps suggesting that reasonable

(continued...)

**[\*14]** to the benefit of any private shareholder or individual". This prohibition looks to benefits conferred on a "private shareholder or individual", generally understood to mean an insider of the organization (such as a member or an officer). See Redlands Surgical Servs., Inc. v. Commissioner, 113 T.C. 47, 74-75 (1999), aff'd, 242 F.3d 904 (9th Cir. 2001). However, the question whether an organization is operated for tax-exempt purposes also requires an examination of the benefits conferred on non-insiders, since--

> [a]n organization is not organized or operated exclusively for one or more of the [tax-exempt] purposes * * * unless it serves a public rather than a private interest. Thus, to meet the requirement of this subdivision, it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests. [Emphasis added.]

26 C.F.R. sec. 1.501(c)(3)-1(d)(1)(ii). Impermissible benefit to "private interests" thus encompasses not only benefit to insiders but also benefits that an organization may confer on unrelated or even disinterested persons, i.e., outsiders. Am. Campaign Acad. v. Commissioner, 92 T.C. 1053, 1068-1069 (1989).

---

[6](...continued)
compensation does not constitute inurement. However, Capital Gymnastics has not contended that "points" conferred on its members are reasonable compensation for their fundraising activities (and that contention would appear to be problematic on this record), so we do not address the concept of reasonable compensation.

[*15] If the organization engages in either inurement or private benefit, then the organization is furthering a non-exempt purpose. Id.; 26 C.F.R. sec. 1.501(c)(3)-1(c)(2), -1(d)(1)(ii). The prohibition against inurement, like the prohibition of private benefit, ensures that the exempt organization is serving a public and not a private interest, Church of Scientology of Cal. v. Commissioner, 83 T.C. 381, 491 (1984), aff'd, 823 F.2d 1310 (9th Cir. 1987), and the two prohibitions thus have a common purpose. And because "private benefit" encompasses but is broader in scope than "inurement", Am. Campaign Acad. v. Commissioner, 92 T.C. at 1068-1069, they overlap. We therefore discuss the issues in tandem below.

### B. Declaratory judgment under section 7428

As an exception to the general principle that action by the tax collector may not be enjoined, see sec. 7421(a), Congress enacted section 7428 to provide an organization with an opportunity to challenge "a determination by the Secretary * * * with respect to the * * * continuing qualification of an organization as an organization described in section 501(c)(3)", sec. 7428(a)(1)(A). Before an organization may receive consideration for a section 7428 declaratory judgment, the organization must first exhaust all administrative remedies within the IRS,

**[\*16]** sec. 7428(b)(2), and the IRS does not dispute that Capital Gymnastics fully exhausted those remedies.

### C.  Burden of proof

Generally, the burden of proof rests on the petitioner to demonstrate that the IRS's determination is incorrect.  Rule 142(a); Rameses Sch. of San Antonio, Tex. v. Commissioner, T.C. Memo. 2007-85.  Capital Gymnastics acknowledges in its brief that it bears that burden.  Tax exemption is a matter of legislative grace, and the organization seeking exemption must show that it "comes squarely within the terms of the law conferring the benefit sought."  Fla. Hosp. Trust Fund v. Commissioner, 103 T.C. 140, 153 (1994), aff'd, 71 F.3d 808 (11th Cir. 1996).  Capital Gymnastics has the burden to overcome the IRS's determination that, because of the manner in which Capital Gymnastics credited fundraising points, (1) part of its net earnings inured to the benefit of private individuals (i.e., parent-members) and (2) it operated in that substantial respect not for the benefit of the public but for the benefit of designated private individuals (i.e., the children of fundraising families).[7]

---

[7]Our jurisdiction is limited to "a case of actual controversy".  Sec. 7428(a). Consequently, we examine only the reasons that the IRS offers (either in its final adverse determination or at trial) as its basis for revoking Capital Gymnastics' exempt status.  Id.; see also Am. Campaign Acad. v. Commissioner, 92 T.C. 1053,

(continued...)

[*17] II.  The parties' contentions

Capital Gymnastics stipulated and the record shows that parent-members were "insiders" for purposes of section 501(c)(3), meaning that the parents exerted direct or indirect control over the organization.  Capital Gymnastics insists nonetheless that it operated exclusively for an exempt purpose.  Capital Gymnastics claims that its method of "unequal sharing of fundraising profits" did not give rise to a "constructive distribution" because the organization "never pays money to any of its members" and instead spends its funds "exclusively on competition-related expenses of the athletes".  Capital Gymnastics therefore contends that the true recipient of its generosity was not the parents but instead "a well-defined charitable class"[8] of "school age children competing on the Training

<hr />

[7](...continued)
1063 (1989); H.R. Rept. No. 94-658, at 285 (1976), 1976-3 C.B. (Vol. 2) 695, 977 ("The court is to base its determination upon the reasons provided by the Internal Revenue Service in its notice to the party making the request for a determination, or based upon any new argument which the Service may wish to introduce at the time of the trial").  We therefore do not consider such issues as whether Capital Gymnastics facilitated improper claims of tax deductions by members, see supra note 3, or whether Capital Gymnastics was operated for the private benefit of the Training Center, see supra note 2.

[8]Capital Gymnastics lays great stress on the fact that its child athletes were all members of a charitable class (a fact that the Commissioner does not deny).  We cannot tell whether Capital Gymnastics means to contend that this fact resolves the organization's tax-exempt status; if it does so intend, then the

(continued...)

**[*18]** Center's amateur gymnastics and power tumbling teams." Its witness testified that a number of the parents chose to fundraise because they "needed the money", but no evidence was offered to back up this statement, and it appears to have been speculation. Capital Gymnastics points to situations where exempt groups raise funds without losing their exempt status, including church youth groups, Cub Scouts, or public school athletic booster clubs that have "kids jumping up and down at the corner gas station exhorting you to get your car washed." Capital Gymnastics maintains that "it seems inconceivable that Congress could have intended such an absurd result" as to prohibit booster clubs from spending any part of their earnings for the benefit of the children who are on an athletic team. In the end, Capital Gymnastics seeks the Court's endorsement that its "method for allocating fundraising profits is not only permissible and

---

[8](...continued)
contention fails. Even if all the activities of an organization redound to the benefit of members of a charitable class, nonetheless, in order to be tax exempt, the organization must still comply with all the requirements of section 501(c)(3), including refraining from inurement and from substantially benefiting private interests. Thus, even when we determine that the beneficiaries of an organization "comprise a charitable class", we nonetheless proceed to assure that there is "no selectivity with regard to the identities of the individual[s] * * * to be benefited", Aid to Artisans, Inc. v. Commissioner, 71 T.C. 202, 215-216 (1978) (emphasis added)--i.e., to assure that there is no impermissible private benefit.

**[\*19]** lawful, but it should be recognized as a 'best practice' for similar organizations to follow."

The Commissioner "does not quarrel" that Capital Gymnastics' mission of fostering amateur sports competition is a qualifying purpose within the meaning of section 501(c)(3) or that the amateur athletes associated with Capital Gymnastics are members of a charitable class. The Commissioner also accepts that fundraising by a booster club is a permissible activity under section 501(c)(3). The Commissioner objects, however, that "almost all of petitioner's fundraised proceeds are earmarked to benefit those individuals who fundraised". The Commissioner contends that this dollar-for-dollar arrangement constitutes inurement and private benefit in violation of section 501(c)(3) because the methodology furthers private interests rather than the team or the organization as a whole.

III. Application of the law to Capital Gymnastics

Applying the law to Capital Gymnastics' facts and circumstances, we find that, in violation of section 501(c)(3), Capital Gymnastics allowed substantial private inurement to the parent-member-insiders who fundraised (by providing to those insiders relief from an economic burden in the form of "points" applied to their assessments) and thereby conferred an impermissible substantial private

**[*20]** benefit on the child-athletes of those parents only (as opposed to its child-athletes generally). Capital Gymnastics authorized parent-members to raise funds for their own benefit but under the name of Capital Gymnastics and trading on its tax-exemption ruling. Capital Gymnastics rigorously assured that its fundraising did <u>not</u> generally benefit all the child-athletes in its programs but rather benefited only the children of parents who did the fundraising.

Moreover, this is not a circumstance (like, say, a school band's sale of candy or a church youth group's carwash for a once-a-year event) in which the fundraising is a tiny fraction of the organization's overall function; here, the fundraising is, instead, the admitted "primary function" of the organization. This is not a circumstance in which the individual's contribution of his share of the cost is optional or where scholarships are made available for those who cannot afford the cost. Nor is this a circumstance in which every member is required to perform fundraising and no one can buy his way out; rather, the fundraising was an option chosen by those who wanted to earn their assessments. The assessments at issue were not arguably de minimis charges that might be covered by a child's paper route or babysitting, but rather were serious parental obligations of as much as $1,400 per year (on top of already considerable tuition of up to $330 per month, plus national dues, registration fees, equipment expenses, and travel expenses).

**[*21]** Capital Gymnastics' fundraising method is in contrast to the operations of organizations that have been held to comply with section 501(c)(3) and to which Capital Gymnastics attempts to liken itself.  For example, in Goldsboro Art League, Inc. v. Commissioner, 75 T.C. 337 (1980), an organization that promoted the appreciation of art had two art galleries that displayed artwork from more than 100 artists.  These galleries were held not to yield inurement or private benefit, even though the works were available for sale, because a jury independent of the organization decided which works to display (and only two of the art pieces were from members of the organization).  Id. at 345-346.  That is, the financial benefits resulting from the organization's activities were neither deliberately focused on its members nor (as here) self-selected by its members.  Similarly, in Aid to Artisans, Inc. v. Commissioner, 71 T.C. 202 (1978), an organization that sold for a profit handicrafts from developing societies of the world was held to operate for a public purpose and not for individual private gain, because the organization benefited a charitable class (disadvantaged communities), the organization selected the handicrafts after researching the socioeconomic structure of the localities without regard to the identities of the individual artisans (e.g., 80 anonymous disadvantaged women living in a small village in Haiti), the organization retained none of the profit, and the handicrafts were not from members of the organization.

**[\*22]**  Conversely, Capital Gymnastics' improper methodology is similar to operations that have been held <u>not</u> to comply with section 501(c)(3).[9]  For example, in <u>Wendy L. Parker Rehab. Found., Inc. v. Commissioner</u>, T.C. Memo. 1986-348, the organization selected the founders' daughter (who had suffered a coma) as a substantial beneficiary of the foundation's funds, so that "[t]hirty percent of petitioner's income is expected to be expended for the benefit of Wendy L. Parker."  The organization thus relieved the family of the economic burden of providing medical care and thereby caused its net earnings to inure to the private benefit of insiders.  In <u>N. Am. Sequential Sweepstakes v. Commissioner</u>, 77 T.C. 1087 (1981), an organization promoted amateur athletic competition in the new sport of "sequential relative" skydiving, but when it paid its creators' expenses for competing in skydiving events, it impermissibly promoted their private benefit.

Even if an organization benefits an individual who is an undisputed member of a charitable class (such as the comatose patient in <u>Parker</u> or the athletes in this case), the organization may, as in <u>Parker</u>, fall afoul of section 501(c)(3) if its net

---

[9]Capital Gymnastics acknowledges the unfavorable precedent that these and other cases have on its litigating position.  In response, Capital Gymnastics offers hypothetical changes to the facts in a number of these cases that (it says) were closer to Capital Gymnastics' facts and may have resulted in favorable outcomes.  Capital Gymnastics also spent a significant part of its arguments discussing two alternate, hypothetical fundraising methods that it never adopted.  We decline to decide hypothetical cases that are not before us.

[*23] earnings inure to the benefit of the child's parents.  Capital Gymnastics made no showing that the parent-members who received its fundraising "points" (i.e., the parents who did fundraising) were actually poor, disadvantaged, in financial distress, or otherwise members of any charitable class.  When an organization benefits members without regard to their being in a charitable class, it fails to further an exempt purpose.  See Retired Teachers Legal Def. Fund, Inc. v. Commissioner, 78 T.C. 280 (1982) (two-thirds of the organization's pensioner-members were not poor or in financial distress); see also Michigan v. United States, 802 F. Supp. 120, 125 (W.D. Mich. 1992) (and cases cited thereat), rev'd on other grounds, 40 F.3d 817 (6th Cir. 1994).

Capital Gymnastics seems to contend that its method of "unequal sharing of fundraising profits" did not give rise to a "constructive distribution" because the parents did not receive actual cash; rather, Capital Gymnastics disbursed the checks directly to the meet sponsors and thereby bypassed the parents.  It cannot be denied, however, that the fundraising parents received a benefit in the form of a reduction in the amount of cash they were required to pay for their children's participation in gymnastics competitions.  The "points" were as good as dollars; Capital Gymnastics used those points to allocate dollars to the benefit of the fundraising parent-members; and the parent-members were to that extent excused

[*24] from mandatory cash assessments they would otherwise have been required to pay to cover their share of competition costs. For purposes of section 501(c)(3), "'benefit'" is a broad term and can include "'[a]dvantage; profit; fruit; privilege; gain; [or] interest'". <u>Retired Teachers Legal Def. Fund, Inc. v. Commissioner</u>, 78 T.C. at 286 (<u>quoting</u> Black's Law Dictionary 143 (5th ed. 1979)). In fact, the benefit received by the parents in this case is analogous to the disqualifying benefit received by the parents in <u>Wendy L. Parker Rehab. Found., Inc.</u>, where the Court concluded that inurement occurred where the organization did not give cash to the parents but instead paid a portion of medical expenses that the parents would otherwise have borne.

The benefit that Capital Gymnastics conferred on fundraising families was hardly insubstantial. Unlike the qualifying organizations in <u>Aid to Artisans, Inc.</u>, and <u>Goldsboro Art League, Inc.</u>, whose insiders received, respectively, zero and less than 2% (2 artists out of more than 100 artists) of the benefits, Capital Gymnastics' members received 93% of the fundraising profits. Capital Gymnastics' figures are substantial both in absolute terms and in relative terms. By comparison, in <u>Wendy L. Parker Rehab. Found., Inc.</u>, a smaller amount of inurement--i.e., 30% of that foundation's $7,500 in income--was still large enough to constitute substantial inurement.

[*25] In holding that Capital Gymnastics' fundraising constituted a substantial non-exempt purpose, we do not overlook its non-fundraising activity. As the Commissioner admitted:

> [I]n addition to its fundraising activities, petitioner disseminates information to its members, holds a few spirit events, and acts as a "conduit" or "clearinghouse" to collect and pay over the competition costs. This administrative activity of assembling funds in a centralized place (petitioner's bank account), forwarding the meet entry fees to the meet sponsors and paying the coaches' expenses so that they could accompany the athletes benefited all the athletes equally. It facilitated the ability of the teams and the athletes to participate in competitions. These administrative-type activities appear to be specifically contemplated by Congress when amending section 501(c)(3) of the Code to include exempt organizations which foster amateur athletic competition. But this administrative activity was not petitioner's primary activity. The primary activity was fundraising which benefited private interests more than incidentally.

We agree. The issue here is not whether Capital Gymnastics had <u>any</u> charitable purpose but whether (as the statute requires) it was operated <u>exclusively</u> for charitable purposes. We hold it was not.

In so holding, we do not criticize (except in the tax-exemption context) Capital Gymnastics' "point" system. Parents who make a serious financial investment in the development of their children's athletic abilities should be free to arrange that activity in the manner they choose. The arrangement that Capital Gymnastics developed may well be a rational, wholesome, just, and efficient

**[*26]** fundraising method (a proposition as to which we have no jurisdiction to make a declaratory judgment); but even if so, it does not further a tax-exempt purpose. Capital Gymnastics' arrangement reflects instead the purpose of promoting the financial interests of its fundraising members.

## IV. Conclusion

For all of the above reasons, Capital Gymnastics operated in a manner that allowed substantial private inurement and promoted private, non-public interests. Therefore, the organization did not operate exclusively for an exempt purpose. We conclude that Capital Gymnastics did not satisfy the requirements of section 501(c)(3) and consequently did not qualify for exemption from tax under section 501(a). We therefore sustain the IRS's final adverse determination.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.